■

Norman E. MINOR, Appellant,

v.

UNITED STATES, Appellee.

Nos. 91–CF–1470, 93–CO–298, and 93–CO–825.

District of Columbia Court of Appeals.

May 23, 1995.

Before WAGNER,* Chief Judge; FERREN,* TERRY, STEADMAN,* SCHWELB, FARRELL, KING, and RUIZ, Associate Judges.

ORDER

■

In re T.J., M.D., & C.J., Appellants.

Nos. 94–FS–140, 94–FS–274 and 94–FS–277.

District of Columbia Court of Appeals.

Argued May 11, 1995.

Decided Sept. 21, 1995.

**4**

Gregory W. Stevens, appointed by the court, Alexandria, VA, for appellant M.D.

Shirin Ikram, appointed by the court, Potomac, MD, for appellant C.J.

Donald B. Terrell, appointed by the court, Washington, DC, for appellant T.J.

Carla Rappaport, with whom Diane Weinroth, Washington, DC, was on the brief, for appellee.

Susan M. Hoffman, Jennifer Lear, and Anne R. Price, Washington, DC, were on amicus brief, for Consortium for Child Welfare.

Before WAGNER, Chief Judge, and STEADMAN and KING, Associate Judges.

KING, Associate Judge:

T.J., a five-year old boy ("adoptee," "child," or "T.J."), M.D., T.J.'s maternal great-aunt ("great-aunt"), and C.J., T.J.'s mother, ("mother," "natural mother," or "C.J."), are appealing the Superior Court's order granting the adoption petition of M.H., T.J.'s foster mother, ("foster mother") and denying the custody complaint of the great-aunt. The neglect, adoption, and custody cases were consolidated, and the adoption and custody issues were tried before Judge Stephen F. Eilperin in November 1993. The parties to the consolidated cases were the District of Columbia ("District"); the child, through his court-appointed guardian *ad li-*tem; the foster mother, the adoption petitioner; the great-aunt, the custody complainant; and, the child's parents, the mother and D.L. ("the father"). At trial, the District, the guardian *ad litem,* and both the child's parents supported the great-aunt's custody petition. We reverse.

## I. Procedural History

### A. The Neglect Case

The proceedings began in the trial court as a petition filed by the government on April 17, 1991, pursuant to D.C.Code § 16–2301 *et seq.*, alleging that the child, then 19 months old, was a neglected child. Following an initial court hearing, held the same day, the court found probable cause to support the neglect allegations and placed the child in shelter care with the D.C. Department of Human Services ("DHS"). The child was subsequently placed at St. Anne's Infant and Maternity Home ("St. Anne's"), an institutional facility for neglected children, where he remained for approximately one year. On January 23, 1992, following a trial on the neglect petition, Judge Gregory E. Mize adjudicated the child neglected pursuant to D.C.Code § 16–2301(9)(C),[1] because of the mother's mental illness. Judge Mize specifically rejected a neglect adjudication pursuant to D.C.Code § 16–2301(9)(B), because the child was not without "proper care or control, subsistence, education ... or other care or control necessary for his physical, mental or emotional health." DHS then, through a private foster-care agency on contract with DHS, For Love of Children ("FLOC"), placed the child in foster care with the foster mother and J.S., her female companion. On March 31, 1992, following a disposition hearing on the neglect case, the trial court entered a disposition order committing the child to DHS.

---

1. D.C.Code § 16–2301(9) in relevant part provides:

   The term "neglected child" means a child:
   (A) who has been abandoned or abused by his or her parent, guardian, or other custodian; or
   (B) who is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his or her physical, mental, or emotional health, and the deprivation is not due to the lack of financial means of his or her parent, guardian, or other custodian; or
   (C) whose parent, guardian, or other custodian is unable to discharge his or her responsibilities to and for the child because of incarceration, hospitalization, or other physical or mental incapacity.

   \* \* \* \* \* \*

Thereafter, the trial court conducted regular review hearings in the neglect case during which the court received information on the mother's condition, including psychiatric evaluations and assessments. On July 8, 1992, the great-aunt appeared in court and expressed interest in obtaining custody of the child. On November 5, 1992, having been advised that DHS and FLOC would be recommending an immediate change in placement for the child to the great-aunt's home, the foster mother filed a petition to adopt the child. On May 24, 1993, the great-aunt filed a complaint for custody, which was consolidated with the neglect and adoption cases.

## B. The adoption petition and custody complaint dispositions

The trial court conducted a seven-day fact-finding hearing on the adoption petition and custody complaint on November 15–19 and 22–23, 1993, at which the foster mother, her partner, and the great-aunt testified. The mother, who appeared briefly on one day of the proceedings, did not testify. The father did not appear. Both the child's parents, however, supported the great-aunt's custody complaint. A total of sixteen witnesses testified, and a number of reports and exhibits were received into evidence. On January 7, 1994, the trial court entered an order granting the foster mother's adoption petition, denying the great-aunt's custody complaint, and effectively terminating the mother's parental rights.

Concluding that there was no real possibility that either biological parent could raise the child, the court found, by clear and convincing evidence, when pitting the foster mother against the natural parents, that the parents were withholding their consent to the adoption contrary to T.J.'s best interest. In the contest for custody between the great-aunt and the foster mother, the court found, by a preponderance of the evidence, that it was in the best interest of the child to grant the foster mother's adoption petition. The court found that both the foster mother and the great-aunt would provide T.J. with a warm and loving home, and that he would have a clearer sense of his racial, cultural, and family identity if he was raised by the great-aunt with his extended family. Nevertheless, because of the strong attachment that had formed between the child and the foster mother, the court determined that the risk of harm to the child if he was removed from his foster mother's care outweighed those considerations. Thus, concluded the trial judge, it was in the child's best interest to be adopted by the foster mother. This consolidated appeal followed. Because the parties contentions focused on the weight of the evidence and the parties' relative evidentiary burdens, we will set forth the evidence in some detail.

## II. Facts

### A. Events leading to the Custody and Adoption Petitions

The child, an African–American boy, was born September 15, 1989, to mother, C.J., and father, D.L. He lived with his mother until he was nineteen months old. The mother suffers from a chronic mental illness (schizoaffective disorder) which, even with treatment, renders her unable to take care of her son on any kind of long-term basis. The child's father has never lived with the mother or the child, has never been involved in the child's life, and has no plans to assume care of the child.

The child was first brought to DHS's attention by his mother in November 1990, when she requested that DHS temporarily place her son in its care because she was experiencing mental problems and was afraid she would not be able to provide appropriate care for him. Several days later, DHS returned the child to her care. Over the next five months, on about four occasions, the mother requested and received emergency care placement for the child for periods of three to ten days because she was overwhelmed with the task of caring for him. On some of these occasions, the child was placed with his great-aunt. In February 1991, the mother placed the child in voluntary foster care at St. Anne's for one month, after which he was returned to her care. On April 17, 1991, the mother again indicated her inability to care for the child and the District filed a neglect petition alleging, *inter alia*, that the mother was unable to care for the child due

to mental illness. The child, then nineteen months old, was placed at St. Anne's. During that period, the great-aunt was unwilling to care for the child for an extended period without the mother's consent or a court order giving her custody. The great-aunt testified that she was seeking to avoid a repetition of the conflicts she had encountered with the mother, including threats of violence and vandalism to her home by the mother, which occurred ten years earlier, when the great-aunt assumed custody of A.J., the mother's twelve-year old daughter, who is T.J.'s sister.

The child remained at St. Anne's for approximately one year pending a fact-finding hearing and disposition. During that time, he experienced behavioral, emotional, learning, and speech problems attributed to his early chaotic life with his mother. St. Anne's initiated behavioral, language and speech therapy, which continued some time after his placement with his foster family. The mother visited the child frequently during his stay at St. Anne's, and the great-aunt visited him once, because she would not "go over [the mother's] head" by visiting the child. On July 8, 1992, three months after the child was committed to foster care with the foster mother, the great-aunt appeared in court and expressed an interest in obtaining custody of the child. She later filed a custody complaint on May 24, 1993.

### B. The Foster Care Placement

The foster mother became a foster parent through FLOC, an organization which administers a program for foster care. Before M.H. became T.J.'s foster mother, she, and her companion, J.S., attended a FLOC training program, where they were instructed that foster care is a temporary service, with a goal of returning the child to the birth family, first to the birth parents, if possible, and then to birth relatives. The foster mother signed a contract to that effect.

In the first few months while the child lived with his foster mother, he continued to exhibit severe behavioral and emotional problems—tantrums, hysterical crying, physical aggression, sleep problems, aimless and unfocused movement and motor activity, destruc-

tive play, and inability to relate to people. Additionally, he only spoke between ten to twenty words. He became clingy towards his foster mother, making separation from her very difficult, and was withdrawn and non-responsive towards others at school and home. His behavior improved after a few months in foster care. The child became talkative, his tantrums subsided, and he displayed a significant interest in physical activity. At the home of his foster mother, the child has his own room and access to a recreation room, a den, and a backyard in which he can play. The child attends an interracial kindergarten and interacts well with children there. He attends church and has friends of various races. The foster mother and her companion, who are both white, have taken the child to various African–American festivals and celebrations, read books to him with African–American characters and have posters of Martin Luther King and of black children portrayed in a positive way. The child is fully integrated into his foster family, his school and church, and his multi-cultural, multi-racial neighborhood and community. The foster mother has a close network of friends and acquaintances, both married and single, through school, work, church and her neighborhood.

When the child was first placed with his foster mother, the agency goal was reunification with his mother. The foster mother complied with the court-ordered visitation with his natural mother and great-aunt, but made no attempts to add extra visits, lengthen visits or add makeup visits. The FLOC social worker testified that she found it difficult to get the foster mother and her companion to cooperate with regard to permanency planning. The relationship between FLOC and the foster mother deteriorated to the extent that FLOC notified the foster mother in writing that she had breached their contract, and would be terminated as general foster parent, retaining that status only as to T.J. during the pendency of this case.

In July 1992, DHS referred T.J.'s case to its "Project 237."[2] The Project 237 social

---

**2.** A special corrective action project developed to    address the need for permanency planning in

worker assigned to T.J.'s case determined that reunification with his mother was not feasible. On July 6, 1992, the social worker contacted the foster mother's companion, and initiated discussion as to whether the foster mother and her companion would be interested in adopting the child. The social worker also contacted the great-aunt, who indicated that she was not prepared to offer the child a home at that time. The social worker informed the great-aunt of the upcoming court review scheduled for July 8, 1992. The great-aunt attended the July 8, 1992 review hearing, and the judge, without addressing the issue of the child's permanent placement, authorized experimental, overnight/weekend visits for the child with his great-aunt at FLOC's discretion. The social worker testified that the great-aunt did not begin visits with the child until September 11, 1992, followed by a late October visit. Both these meetings took place at FLOC. After these two visits, the FLOC social worker indicated that she wanted to schedule weekend visits, and the foster mother's companion indicated that she did not think it was appropriate because of the child's reactions and regressions after visits with his mother, and during and after the two visits with his great-aunt at FLOC. It was at that point that the foster mother and her companion learned that FLOC would be recommending an immediate change of placement for the child at the scheduled November 18, 1992 court review. The foster mother testified that after consulting with various child mental health professionals, including the child's therapist, she filed the instant petition for adoption on November 5, 1992.

At the November 18, 1992 review hearing, the judge rejected the agency's recommendation for an immediate change of placement, instead ordering an independent psychiatric assessment to evaluate the child's psychological bonding and the effect, if any, a move to his great-aunt's home would have on him. He also ordered a home study of both the

great-aunt and the foster mother by the Court's Social Services Division, and experimental, overnight/weekend visits with the great-aunt at FLOC's discretion, but not to exceed once every two weeks.

## C. The Parties' Backgrounds

The trial court made the following findings of fact concerning the relevant parties. M.H. and J.S., the foster mother and her companion, are a white lesbian couple who have been together for over five years. M.H., then thirty years old, is an attorney, and J.S., then forty-nine years old, has a masters degree in developmental and educational psychology, and is employed as a sociologist with the Children's Defense Fund. They both have extensive experience with children's issues through their professional and volunteer work. They are a stable, emotionally mature couple, who have established a comfortable home together in a multi-racial, multi-cultural, upper middle-class neighborhood. They are both actively involved in their church's educational and public service activities. They have a network of friends available to take care of the child should it become necessary, but have no relatives on whom they could rely.

M.D., then sixty years old, is the adoptee's great-aunt by marriage, who lives in a single-family home with a fenced-in backyard in the Mount Pleasant area of the District of Columbia. She has successfully raised eight children of her own. She has previously provided a home for the adoptee's mother, and she has had custody of the adoptee's sister, A.J., the natural mother's twelve-year old daughter, since the girl was two years old.[3] Two of the great-aunt's older sons live with her, and her other children visit with her regularly. Her home is the hub of a large and extended African–American family where the child has several individuals responsible for meeting his needs. As of November 1993, the adoptee, who had spent

cases of children who had been in foster care for more than eighteen months with an unmet case plan goal of "reunification." Project workers investigated whether reunification remained a realistic goal and, if not, developed alternative permanency recommendations.

3. C.J., the natural mother of T.J., is also the natural mother of A.J., the twelve-year old girl who has been cared for by the great-aunt for ten years. Apparently A.J. and T.J. have different fathers.

approximately twenty-five weekends in the great-aunt's home, appeared, to various observers, to be comfortable there and to interact warmly with the individuals in the home, especially his sister.

One of the great-aunt's sons, G.P., is a narcotics investigator with the Metropolitan Police Department who lives with his wife and two children, ages eleven and seven. The great-aunt takes care of G.P.'s children every weekend, and G.P. and his wife expressed a willingness to help with the adoptee should the need ever arise. The great-aunt's daughter, R.L., a management specialist at Walter Reed Army Medical Center, is married with two children, a three-year old and a ten-year old. The great-aunt takes care of these children while R.L. is at work. The trial court found that R.L. and her husband stand ready to offer the adoptee a home should anything happen to the great-aunt. The trial court recognized that the great-aunt is "an extraordinary person. She is a strong, loving, dignified, highly moral, religious person." She has significant experience in raising her own children, and the trial court found that she has also raised the adoptee's sister with love, care and skill, and that the sister is a well-adjusted twelve-year old who excels in school and has a firm sense of herself.

### D. The Expert Opinions as to T.J.'s Best Interest

The trial court heard testimony from two psychiatrists called in support of the foster mother's adoption petition, two psychologists called in support of the great-aunt's request for custody, and several other experts regarding the impact on the child of a change of placement from the foster mother's home to the great-aunt's home. The expert opinions were divided as to which placement would serve the child's best interest. The witnesses for each side agreed that both the great-aunt and the foster mother were able to provide safe, loving, nurturing home environments and a proper education for the child. All the witnesses also acknowledged the advantage of placement with the great-aunt, who was able to provide the benefits of her extended family and its connection to the

African–American culture and male role-models. The experts disagreed, however, on the extent of the child's attachment to the foster mother, and the harm to the child that would result if he were returned to his family.

### 1. The Experts who Supported the Great-aunt's Custody Complaint

The great-aunt called Dr. Ronald Wynne, a forensic psychologist, who testified that he had examined the child and found that a bond existed between the great-aunt and the child, and between the child and his sister. He found the child's relationship to his sister to be significant to his development, stating:

> I like the relationship between those two children. She's crazy about him and he seems to be crazy about her. They are likely to have a relationship that would last 60, 70, 80 years, closely bonded. That would be wonderful.

Dr. Wynne also testified that living in the great-aunt's multi-generational home would strengthen the child's self-image and his experience of family. Dr. Wynne opined that the transition to the great-aunt's care would go well because the child was able to bond with the great-aunt, and that there would be no enduring consequences if he were placed with her.

Dr. Beverly Davis, the administrator for the District's Family Services Administration, also testified on the great-aunt's behalf. She opined that the best place for the child was with his great-aunt, stating that the evidence of the great-aunt's ability to be a good parent to the child was her ongoing success with his sister. Dr. Davis concluded that the child is really part of his great-aunt's family:

> African–American families have a long standing tradition of having extended kin who may not be biologically related, but are related in terms of the relationship of that family. And that is exceedingly important in our definition of self and has been one of the hallmarks that I think have been important in terms of our own survival as a people.

She agreed with Dr. Wynne on the significance of the child being raised in his great-

aunt's home but gave no opinion on the psychological impact the change to the great-aunt's household would have on him.

Dr. Frederic Phillips, a clinical psychologist who specializes in child-family psychology, was called by the child's guardian *ad litem*, strongly advocated the child's move to his great-aunt's home. He testified that a child is expected to attach to the foster parent, and, indeed, that an important quality of a good foster-care arrangement is such an attachment. He testified, however, that the existence of an attachment does not become the "riveting reason for what should happen in the permanent interest of that child." Dr. Phillips echoed both Drs. Wynne's and Davis's opinion on the advantages of the great-aunt's home in terms of providing the child with a strong sense of his cultural, racial, and gender identity. He opined that the child's racial identity was a process that could not be created merely with pictures of Martin Luther King and an occasional visit with a black, male role model. He determined that the child would be able to move through the transition process comfortably with appropriate social work.

### 2. Experts Supporting the Petition for Adoption

Dr. Floyd Galler, a child and adult psychiatrist, testified that the child had developed an attachment to his foster mother that should not be broken. He opined that taking the child from the foster mother would inflict permanent scarring, short-term sadness, a life-long risk of depression and difficulty forming a conscience. Dr. Galler testified that, in a trans-racial adoption, there are special steps that adoptive parents can take to supplement the child's upbringing, to help the child develop a comfortable sense of his or her racial identity. Dr. Galler did not believe that the benefits of placing the child with the great-aunt outweighed the risk of moving him.

Dr. James Eagan, a child and adult psychiatrist, testified that the most important psychological task for a child to develop to become a healthy adult is to form an attachment to a caretaker or several caretakers. Dr. Eagan believed that moving the child

from his foster mother would substantially increase the risk that he would not be able to attach again. Dr. Eagan opined that it was in the child's best interest to remain in the foster mother's home. Ms. Betty Brooks, the child's therapist, also testified in support of the adoption.

Dr. Galler, Dr. Eagan, and Ms. Brooks all testified that moving the child would be harmful in light of his early chaotic life, his history of multiple moves and institutionalization, his early and severe behavioral and emotional problems and delays, and his strong, trusting, parent-child attachment to his foster mother. No matter what he was told, the child would view the move to his great-aunt's home as an abandonment by the "parents" he had come to trust; severing the attachment would result in long-term serious harm to the adoptee, who was still a vulnerable child. Finally, these experts testified that contrary to the potential harms faced by the child if he were moved, no "affirmative" harm would result if he were allowed to be adopted by the foster mother.

### III. The Trial Court's Findings

The trial judge found that the adoptee, who had been a seriously disturbed child, had "blossomed" into a happy, active, normal, although still vulnerable little boy and that this was attributable to the foster mother's extraordinary parental abilities and her consistent nurturing and love. The judge found that against long odds, the child had succeeded in establishing a son/mother attachment with his foster mother, and that bond should not be severed. The trial court set forth the evidentiary burdens of the great-aunt and the foster mother as follows:

> To the extent these cases are a contest between [the great-aunt and the foster mother], neither enjoys a presumption that she should prevail. What is best for [the child] is to be decided by a preponderance of the evidence. And although they stand on equal footing in terms of their evidentiary burdens [, the great-aunt] as the choice of [the child's] parents and as a close family member obviously has weighty considerations in her favor.

The court then addressed the evidentiary burden of the foster mother versus the natural parents, focusing on the ability of the natural parents to raise the child themselves, and ruled that the foster mother "must convince the court by clear and convincing evidence that the parent['s] opposition to the adoption is contrary to [the child's] best interest." While acknowledging that the parents' wishes were important considerations in deciding whether the great-aunt should have custody, or whether the foster mother should be allowed to adopt, the court gave no significant weight to that factor. Indeed, the trial court gave the parents' wishes no more weight than it gave any other factor. The trial court then granted the adoption petition and denied the custody complaint of the great-aunt, finding:

> For me the pre-eminent reasons for approving [T.J.'s] adoption, despite my confidence in his great-aunt's competence to provide him a warm and loving home, are [the adoptee]'s fierce attachment to [the foster mother], the wonders she has accomplished with him, her extraordinary parental abilities, and the serious risk that pulling [the adoptee] away from her will permanently scar his development.

The court concluded that, "[i]n my judgment these considerations, on balance, outweigh his parents['] wishes and the advantages to being raised by [the great-aunt] in the company of his extended family." In short the trial court found, by a preponderance of evidence, that the foster mother should prevail over the custodian chosen by the parents.

## IV. Standard of Review

■ We review a trial court's order granting an adoption for abuse of discretion, and determine whether the trial court "exercised its discretion within the range of permissible alternatives, based on all the relevant factors and no improper factor." *In re Baby Boy C.*, 630 A.2d 670, 673 (D.C.1993), *cert. denied*, — U.S. —, 115 S.Ct. 58, 130

L.Ed.2d 16 (1994). In evaluating the trial court's exercise of discretion, we assess whether the court has applied the correct burden of proof. *See Santosky v. Kramer,* 455 U.S. 745, 757 n. 9, 102 S.Ct. 1388, 1397 n. 9, 71 L.Ed.2d 599 (1982); *Appeal of H.R.,* 581 A.2d 1141, 1182–83 (D.C.1990). We then evaluate whether the trial court's decision is "supported by substantial reasoning drawn from a firm factual foundation in the record." *In re D.I.S.,* 494 A.2d 1316, 1323 (D.C.1985).

## V. Legal Analysis

This case presents the issue of what right, if any, a mother [4] (parent) retains, with respect to the selection of a custodian for her child, where: the mother's parental rights have not been terminated; she has not relinquished those rights; she is not mentally incompetent to plan for her child's future, but is unable by reason of her mental condition to take personal care of her child; and she has not been adjudicated as a mother who failed, voluntarily, to provide proper parental care. We have never had occasion to resolve this issue, although we have acknowledged its existence:

> [w]hen there are competing petitions for adoption, there is a complex, unresolved question whether the child's noncustodial mother, whose parental rights have not been terminated, *can dictate the result by consenting to adoption by one of the parties but not the other.*

*In re Baby Girl D.S.,* 600 A.2d 71, 87 (D.C. 1991) (emphasis added). In dicta we suggested that the mother's choice could be overcome only by a very strong showing on the prospective adopter's part:

> if ... the party who does not receive the mother's consent must prove by clear and convincing evidence that such consent is unreasonably withheld, in the best interest of the child, when that party seeks to

---

4. Our discussion applies, of course, to the right of natural parents with respect to the placement of their child. Here, the father consented to the custody request by the great-aunt, but has not otherwise played any role in the raising or decision-making relating to the child. The mother was the initial custodian of the child, and it is her role in this case that is central to this controversy. As a result, we will generally refer to the rights of the mother, with the understanding this is a handy reference which applies to natural parents in general.

adopt, this does not strike us an inappropriate burden.

*Id.* at 89.

■ We now take the step, not taken in *Baby Girl D.S.*, and hold that unless it is established that the parent is not competent to make such a decision, a child and the natural parents share a vital interest in preventing erroneous termination of their natural relationship, and, therefore, a parent's choice of a fit custodian for the child must be given weighty consideration which can be overcome only by a showing, by clear and convincing evidence, that the custodial arrangement and preservation of the parent-child relationship is clearly contrary to the child's best interest. *See Santosky,* 455 U.S. at 760, 102 S.Ct. at 1398.

■ In reaching this conclusion, we emphasize that in this case the natural mother of the minor child, T.J., who is unable to care for him personally by reason of her mental condition, nevertheless has the capacity to designate a suitable and willing custodian and has done so. The trial court found the designated custodian, a family member, to be a strong, loving, dignified, highly moral, religious person, with significant experience raising her own children, and who had under her care and custody for ten years, T.J.'s sister, a well-adjusted twelve-year old who excelled in school. Under these circumstances, before rejecting the designated custodian's petition and severing the child's relation with his parent, sister, and other relatives in the context of a consolidated adoption proceeding, the trial court must find by clear and convincing evidence both that the custody arrangement chosen by the mother would clearly not be in the best interest of the child

and that the parent's consent to adoption is withheld contrary to the child's best interest.[5] *In re J.S.R.,* 374 A.2d 860, 864 (D.C. 1977).

■ The trial court erred in bifurcating two interrelated issues, disposing of the merits of the mother's retention of custody of the child herself as against the merits of the prospective adopter's claim, applying a clear and convincing standard, and then weighing the great-aunt's petition for custody against the petition for adoption applying the preponderance of the evidence standard. The major fallacy in this approach is that it gave far too little weight to the mother's right to choose the custodian for her child by applying an incorrect standard of proof to that consideration.[6] In short, the trial court erred in placing the mother's wishes on an equal footing with the other factors it considered.[7] The trial court effectively ruled that the mother's parental rights should be terminated when it determined that as between the mother and the prospective adopter, adoption was in the child's best interest and the mother's consent was withheld contrary to that interest. We have said that termination of parental rights is an extreme remedy. *In re L.L.,* 653 A.2d 873, 890 (D.C.1995). Therefore, a ruling which effectively terminates parental rights, as this one did, must be supported by clear and convincing evidence. *J.S.R., supra,* 374 A.2d at 864; *see also In re D.R.M.,* 570 A.2d 796, 804–05 (D.C.1990).

■ The Supreme Court has recognized that natural parents have a "fundamental liberty interest in the care, custody, and management of their children" which is protected by the fourteenth amendment,[8] and

---

5. Adoption has the legal effect of severing all rights and duties between the adoptee and his natural parents, their issue and collateral relatives. D.C.Code § 16–312(a) (1989).

6. The availability of a suitable family member, willing to assume legal custody of the child, is an important consideration in the court's decision whether to terminate the parent-child relationship. *See In re Baby Girl D.S.,* 600 A.2d at 83–84.

7. The trial court set forth eight considerations it weighed, including the wishes of the parents, in

applying the best interest standard. Those considerations are set forth in a quote from the trial court's written opinion, *infra* at pp. 15–16.

8. Constitutional protections, applicable to the states through the fourteenth amendment, although not directly applicable to the District of Columbia, extend to the District through the due process clause of the fifth amendment. *Orange v. Bd. of Elections and Ethics,* 629 A.2d 575, 579 n. 5 (D.C.1993), citing *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 694 n. 5, 98 L.Ed. 884 (1954).

gives parents the freedom to make personal choices in matters of family life. *Santosky*, 455 U.S. at 753, 102 S.Ct. at 1394–95.[9] Furthermore, natural parents do not lose this constitutionally protected interest "simply because they have not been model parents or have lost temporary custody of their child[ren].... Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life." *Id.* We have held that state intervention in the parent/child relationship is subject to constitutional oversight, *In re Baby Boy C.*, 630 A.2d at 673, and we have recognized that absent termination of parental rights or some other finding that the parents should no longer be permitted to influence the child's future, the parents' rights necessarily include the right to consent, or withhold consent, to the child's adoption. *Baby Girl D.S.*, 600 A.2d at 86 n. 21; D.C.Code § 16–304 (1989) (consent to adoption); D.C.Code § 16–2361(b) (negating notice requirement of adoption statute once parental rights have been terminated). This right to consent must be guarded just as zealously as the Constitution guards the right of a natural parent to the custody and companionship of his or her child.[10] *See D.S. v. F.A.H.*, 684 S.W.2d 320, 323 (Ky.1985) (court should consider any less drastic measure other than termination of parental right, to accomplish the child's best interest); *Davis v. Jurney*, 145 A.2d 846, 849 (D.C. 1958) (even though all considerations, including parents' rights, must yield to the child's best interest, application of that broad principle does not demand that the right of a parent should be ignored). *But see In re Violetta B.*, 210 Ill.App.3d 521, 154 Ill.Dec.

896, 903, 568 N.E.2d 1345, 1352 (1991) (best interest of child is paramount even to parents' constitutional rights).

We find substantial further support for the conclusions we reach in *Freeman v. Chaplic,* 388 Mass. 398, 446 N.E.2d 1369 (1983), which involved a custody conflict between the maternal step-grandmother, Freeman, and the paternal grand-parents, the Chaplics, for custody of a thirteen-year old girl, Lynn–Marie. The birth mother had consented to the Chaplics' custody petition and refused to consent to Freeman's petition. Focusing its inquiry on the mother's ability to care for the child, and the provisions that she made for those times when she was unable to do so, the court held that "[a]s a general matter, granting custody to a party opposed by the parents where neither the parents nor the parents' nominee is unfit or unsuitable ... would raise serious constitutional difficulties." *Freeman,* 446 N.E.2d at 1375. The thirteen-year old child who was the subject of this custody conflict had been living with Freeman, with whom she had a close, loving relationship, in a custody arrangement precipitated by the mother's hospitalization because of a nervous breakdown. After the Chaplics filed a petition for guardianship, to which both natural parents consented, they were appointed guardians with custody. The child adjusted well in the Chaplics' household, developing a warm relationship with her two siblings who were also in the Chaplics' custody.

The trial court, over the natural parents' objection, revoked the decree appointing the Chaplics guardians with custody, and appointed Freeman as custodian.[11] Among the

---

9. *See also Quilloin v. Walcott,* 434 U.S. 246, 255, 98 S.Ct. 549, 554–55, 54 L.Ed.2d 511 (1978); *Smith v. Organization of Foster Families,* 431 U.S. 816, 845, 97 S.Ct. 2094, 2110, 53 L.Ed.2d 14 (1977); *Moore v. East Cleveland,* 431 U.S. 494, 499, 97 S.Ct. 1932, 1935–36, 52 L.Ed.2d 531 (1977); *Cleveland Bd. of Education v. LaFleur,* 414 U.S. 632, 630–40, 94 S.Ct. 791, 801–02, 39 L.Ed.2d 52 (1974); *Stanley v. Illinois,* 405 U.S. 645, 651–52, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551 (1972); *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944); *Pierce v. Society of Sisters,* 268 U.S. 510, 534–35, 45 S.Ct. 571, 573–74, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626–27, 67 L.Ed. 1042 (1923).

10. We do not speak here of situations where a parent withholds consent to an adoption, but has not devised any alternative plans for the permanent placement of the child. Nor are we addressing the standard to be applied in those circumstances where the parent has been found in a judicial proceeding to have abused the child. We are dealing only with the custody wishes of a parent who, through no fault of her own, is unable to care properly for her child.

11. During the pendency of this action, the natural mother was adopted by the Chaplics and was living with them along with her other two children.

trial court's findings were the following: (1) both the Chaplics and Freeman were fully capable of caring for Lynn–Marie; (2) the birth mother possessed the capacity to assent to the appointment of the Chaplics as guardians with custody of the child; (3) assent by the parents should be given little weight because the father has had little contact with the child, and the mother was suffering from emotional problems; (4) the parents' custody choice was designed to maintain the closest possible ties between the child and her parents, siblings, and paternal grandparents, the Chaplics; and (5) that the appointment of Freeman would serve the child's best interest. *Freeman,* 446 N.E.2d at 1372. On the basis of the last finding, the trial court vacated the appointment of the Chaplics and awarded Freeman custody.

The Supreme Judicial Court of Massachusetts reversed, holding that where the trial court found the parents fit and competent to make decisions about the child's future, and their choice of custodian was also suitable, the judge is bound to honor the parents' wishes, to the extent permitted by statute, on the choice of a custodian. Furthermore, "ties of affection which exist between a child and a person who has had custody of the child *must yield to the desires of the parents to raise the child in a fit environment.*" *Id.* at 1376 (emphasis added).

A Florida court has also recognized that the mother's custody choice must be given weighty consideration. In *Berhow v. Crow,* 423 So.2d 371 (Fla.1982), a teenage birth mother gave custody of her daughter to the Berhow family, who then became licensed foster parents in California where they were registered as the child's parents with the consent of the natural mother. Shortly thereafter, the natural mother died, and the Berhows petitioned to adopt the child with the consent of the birth father, in a California court. During the pendency of that pro-

ceeding, however, the maternal grandparents, under false pretense, removed the child from the Berhow home, took her to Florida, and adopted her there, without notifying the Berhows. Upon learning of the adoption, the Berhows moved to vacate the adoption order, but the trial court denied the motion on the ground that the Berhows lacked standing to challenge the adoption. The court of appeals reversed, holding that the Berhows, as the birth mother's choice of custodian, had "demonstrated a due process liberty interest in maintaining their close family relationship with [the child.]" *Berhow,* 423 So.2d at 371. The Berhows, therefore, had standing to challenge the adoption and should have received notice of the adoption proceedings. *Id.* at 373. The court found dispositive the fact that the child had been placed with the Berhows for more than temporary care by the natural mother. *Id.*

Finally, a New York court granted an adoption to the mother's choice of custodian because the authorized agency providing foster care also supported the adoption. *In re Guardianship of the D. Children,* 177 A.D.2d 393, 576 N.Y.S.2d 136 (1991). The natural mother had voluntarily placed both her infant sons in foster care with a Mrs. Harding. Shortly thereafter, the natural mother died, the grandmother's custody petition was denied, and an appeal was taken. The appellate court held that the grandmother did not have precedence for custody over the adoptive parents selected by the authorized agency.[12] *Id.; but see Worley v. Jackson,* 595 So.2d 853 (Miss.1992) (the parental choice must yield to the judge's determination of what is in the children's best interest, unless that determination is manifestly wrong); *In re Stephanie M.,* 7 Cal.4th 295, 27 Cal. Rptr.2d 595, 867 P.2d 706 (1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 277, 130 L.Ed.2d 194 (1994) (parent's choice of custodian not within the child's best interest).[13]

12. The appellate court did not indicate how much weight, if any, was given to the mother's choice of custodian, although this may be because the mother's choice coincided with that of the authorized agency. But, even assuming the court did not rule on the basis of the mother's choice, that case nonetheless provides support for our holding in this case, because the court ruled on the basis of the choice made by the

agency authorized to permanently place the children. In this case, both FLOC and DHS also favored the great-aunt as the custodian of the child.

13. Both of these cases are factually distinguishable from this case: In *In re Stephanie M.,* the parents had physically abused the child and the court found that their choice of custodians, the

There was substantial evidence in this case that the mother was unable to care for the adoptee herself, and the trial court so found by clear and convincing evidence—a finding which we do not fault. There was no evidence, however, that the mother was incapable of making decisions about her son's future. To the contrary, there is considerable undisputed evidence in this record that the mother always ensured that someone would provide for the child's needs when she believed she was unable to do so herself. For example, in the neglect proceedings Judge Mize specifically found that:

> [t]he evidence demonstrates that actions were taken with forethought by the mother to assure that [the adoptee] was properly taken care of by another.[14]

The mother selected a suitable custodian, the child's great-aunt. The trial court described the great-aunt as an "extraordinary ... strong, loving, dignified, highly moral, religious person" who has successfully raised eight of her own children. The trial court also found that the great-aunt has been raising the child's older sister for ten years, "with love, care and skill, [and the sister] is a well-adjusted 12 year-old, who excels in school and has a firm sense of herself." Finally, the great-aunt has a strong family-support network who "stand ready" to offer the child a home should anything happen to her.

It is significant, in our view, that there is no evidence that the mother made any decision harmful to the child, or that the trial court found that the great-aunt was in any way unfit or unsuitable to be his custodian. Granting the great-aunt custody of the child would strengthen the natural bonds of the family, permit the child to be raised with his sister, and preserve the relationship with his mother and other members of his extended family. On the other hand, granting the foster mother's adoption petition ignores the mother's constitutional rights to participate in decision-making relating to the rearing of her child without a formal finding that she has forfeited her right to do so. Granting the foster mother's adoption petition would also sever the child's connection with his blood relatives. In holding that the trial court here failed to properly take into account the mother's rightful role in her son's future, we endorse the observation of the Supreme Court in *Moore v. East Cleveland,* 431 U.S. 494, 505, 97 S.Ct. 1932, 1938–39, 52 L.Ed.2d 531 (1977), which the Supreme Judicial Court of Massachusetts in *Freeman* also found weighty:

> Out of choice, necessity, or a sense of family responsibility, it has been common for close relatives to draw together and participate in the duties and the satisfaction of a common home. Decisions concerning child rearing, which ... have [been] recognized as entitled to constitutional protection, long have been shared with grandparents or other relatives who occupy the same household—indeed who may take on major responsibility for rearing of the children. Especially in times of adversity, such as the death of a spouse or economic need, the broader family has tended to come together for mutual sustenance and to maintain or rebuild a secure home life.

*Freeman,* 446 N.E.2d at 1375 n. 11.

Unless a child's parents have in some manner forfeited the right to direct the upbringing of their children, the parents have the right to determine what is in their child's best interest. *See Appeal of H.R.,* 581 A.2d at 1177 (Ferren, J.) ("It would seem inherent in the very concept of a fit parent that such a parent would be at least as

---

maternal grandmother or, in the alternative, the aunt, would be unable to protect the child from further physical abuse by the parents. In *Worley v. Jackson,* the maternal grandparents who were the mother's choice sought temporary custody on grounds that they had *in loco parentis* status. The court found that no *in loco parentis* status existed, and awarded the paternal grandparents custody because, among other considerations, they sought to have permanent, as opposed to temporary custody, which was in the best interest of the children. Furthermore, the court found that such a custodial arrangement in no way impaired the mother's future parental rights.

14. Thus, the court adjudicated T.J. neglected under D.C.Code § 16–2301(9)(C), due to the mother's mental illness and not pursuant to § 16–2301(9)(B) because, "T.J. was not without proper care or control, subsistence, education ... or other emotional health." *See supra,* note 1.

responsive as the trial court, very probably more so, to the best interest of the child."), citing *In re Guardianship of Smith*, 42 Cal.2d 91, 265 P.2d 888, 891 (1954) (en banc) (Traynor, J., concurring). That right includes the right to raise the child if physically or mentally able to do so, or, if not, the right to determine who should raise the child.[15] *Id.*

▋ Taking all of these considerations into account, we conclude, on the facts of this case, that the mother's choice of a suitable custodian and the household in which her son should be reared should have been accorded far greater weight by the trial court, and it was error for the court not to give effect to the mother's choice of custodian for her child absent a showing, by clear and convincing evidence, that the choice would be clearly contrary to the child's best interest. *See Freeman*, 446 N.E.2d 1369; *Berhow*, 423 So.2d 371; *In re Guardianship of the D. Children*, 576 N.Y.S.2d at 137; *see also, D.S. v. F.A.H.*, 684 S.W.2d at 322 (where mother's inability to care for her child is neither self-imposed nor deliberate, placement with a family member must be considered prior to termination of parental rights).

We agree with the foster mother's observation that the child's best interest should be the determining factor for the trial court. The natural mother's views, however, at least under the circumstances presented here, must be taken into consideration in determining what is in the child's best interest. *See Appeal of H.R.*, 581 A.2d at 1177. Moreover, in this case the guardian *ad litem, i.e.,* the child's representative, DHS, and FLOC, the agency with legal custody of the child, all support the mother's choice of custodian. *See In re Guardianship of the D. Children*, 576 N.Y.S.2d at 137 (blood relative has no precedence for custody over adoptive parents selected by the authorized agency).

## VI. Conclusion

Having held, on the facts of this case, that the parents' choice of custodian should have been accorded far greater weight, we turn now to a discussion of the applicable legal standard, mindful that the determination of what is in the child's best interest cannot be accomplished by imposing formulas, doctrines, presumptions, or a rigid hierarchy of placement alternatives. *See In re D.G.*, 583 A.2d 160, 165 (D.C.1990); *In re D.I.S.*, 494 A.2d at 1323; *Bazemore v. Davis*, 394 A.2d 1377, 1383 (D.C.1978) (en banc). Before doing so, we note preliminarily that, contrary to the foster mother's contention, we do not understand the appellants' argument to be that the trial court should have elevated some other right or interest above the child's best interest. The issue is whether the trial court applied the correct evidentiary standard, and whether the trial court required the parties to bear the appropriate evidentiary burden, in weighing the factors that guide the best interest analysis.

In deciding between the competing petition of the foster mother and the great-aunt the court applied a preponderance of the evidence standard to determine the child's best interest, stating:

> The best interest standard calls upon the court to look at [the child's] life from many perspectives—[the child's] bonding or attachment with those who wish to bring him up; his parents wishes; the trauma he would face if moved from the [foster mother to the great-aunt's] care; how that move would affect his growth as a person; the difficulties and prejudices [the child] would be faced with as a result of a transracial lesbian adoption; the advantages and support offered by an extended family; the respective abilities of each side to give [the child] a real sense of his cultural, ethnic and biological heritage; as well as the potential of each to share their love

---

15. Thus, where the parent/child relationship is intact, a state may only intrude in that relationship in very limited circumstances in the public interest, or for the protection of the child. Normally, such intervention does not permanently sever the parent/child relationship. *See, e.g., In re A.C.*, 573 A.2d 1235, 1246–47 (D.C.1990);

*Prince v. Massachusetts*, 321 U.S. 158, 167, 64 S.Ct. 438, 442–43, 88 L.Ed. 645 (1944) (citing *People v. Pierson*, 176 N.Y. 201, 68 N.E. 243 (1903) (the right to practice one's religion does not include liberty to expose the child to communicable diseases, ill health or death).

and to give [the child] a real sense of himself.

For the court, the "pre-eminent reasons" for granting the foster mother's adoption petition, despite being confident that the great-aunt was a fit custodian, was the adoptee's attachment to the foster mother, the progress he made while in her care, and the risk of a permanent emotional scar if he were removed from her. Finally, the court ruled that by a preponderance of the evidence, on balance, these considerations outweighed his parents' wishes, and the advantages of being raised by his great-aunt in the company of his extended family.

We hold that the court erred in applying the preponderance of the evidence standard when weighing the foster mother's interest against the mother's right to preserve the relationship of parent and child and to exercise her choice of the great-aunt as custodian. If the mother had not sought to preserve the family relationship and had not come before the court supporting a suitable family member as custodian for the child, or if parental rights had been terminated, then the trial court would be correct in employing the preponderance standard in resolving the competing petitions of the foster mother and the great-aunt. *In re D.I.S.*, 494 A.2d at 1325–26. However, this is not simply a case of competing petitions for adoption between unrelated parties. It is a case between a natural mother, who seeks to preserve the relationship of parent to child, and who designated a suitable custodian to care for her child, and an unrelated party who seeks to adopt him.

Where the parent(s) have unequivocally exercised their right to designate a custodian, *i.e.*, made their own determination of what is in the child's best interest, the court can "terminate" the parent(s)' right to choose only if the court finds by clear and convincing evidence that the placement selected by the parent is clearly not in the child's best interest, and the consent to adoption has been withheld by the parent contrary to the child's best interest. The non-parent seeking adoption must carry that burden of proof.[16]

Applying these considerations to the facts presented here, we conclude that the foster mother failed to show by clear and convincing evidence [17] that the mother's custody choice was clearly not in the adoptee's best interest. There is overwhelming record support for the court's finding that the great-aunt would be a fit custodian. Moreover, custody with the great-aunt would ensure that T.J. would be in the company of his cousins and sister. With respect to those relationships the trial court found that T.J. enjoys the company of his cousins and is very attached to his sister. The mental health experts who testified were divided on the issue of the extent and degree of harmful

16. The application of the preponderance of the evidence standard in *D.I.S., supra*, 494 A.2d at 1316, a case where there were competing petitions for adoption by two non-parents, is inapposite under the facts of this case, In *D.I.S.*, the court distinguished the case from *J.S.R., supra*, 374 A.2d at 864 where we applied the clear and convincing standard, observing that the issue in *J.S.R.* was whether a natural parent, who has a constitutionally protected interest in raising his own child, is withholding consent to the adoption contrary to the child's best interest. In *D.I.S.*, the mother was deceased and the father consented to one of the competing petitions. Thus, the father did not seek to preserve, as the mother does in this case, the parent-child relationship; he was willing to have that relationship terminated in favor of one of the competing non-parents. The circumstances are quite different where a mentally or physically disabled parent is seeking to preserve the parent-child and family relationship through the support of a custodial plan for

his or her child's care as set forth in a petition for custody which is being considered along with a petition for adoption filed by an unrelated person. For the reasons previously stated, the higher clear and convincing standard must apply because of the parent's protected interest in determining the upbringing of his or her child, and because the issues concern the termination of those rights.

17. A preponderance of the evidence is "proof which leads the [fact finder] to find that the existence of the contested fact is more plausible than its non-existence." *In re D.I.S.*, 494 A.2d at 1326 (quoting McCormick on Evidence § 339 (E. Clearly 3d ed. 1984)). The standard of clear and convincing proof requires evidence that will "produce in the mind of the trier of fact a firm belief or conviction *as to the facts sought to be* established." *District of Columbia v. Hudson*, 404 A.2d 175, 179 n. 7 (D.C.1979) (en banc) (citation omitted).

consequence to the child if there was a change of placement.

Placing particular emphasis on the adoptee's attachment to the foster mother,[18] the trial court concluded that the evidence "on balance" favored granting the foster mother's adoption petition. If the mother had expressed no preference, that ruling, on this record, may well have been within the acceptable range of the court's exercise of discretion. *See In re Baby Girl D.S.*, 600 A.2d at 82. The trial court, however, did not find, and we think from this record, could not find, by clear and convincing evidence, that placement of the child with the great-aunt would be clearly contrary to the child's best interest.[19] Indeed, the trial court found as fact that the great-aunt was a highly moral and dignified person, with significant experience raising her own children, and who was raising T.J.'s sister, a well-adjusted twelve-year old.

For all of these reasons we conclude that the trial court erred in rejecting the custodial arrangement selected by the mother. In so concluding, we echo the sentiment expressed in T.J.'s brief:

> T.J. has a family ... that is supportive, that loves him and is willing and able to care for him. In this country, it still means something to have a family with which one shares biological and cultural identity where a child can grow up.

*See also In re D.I.S.*, 494 A.2d at 1324 (under similar circumstances, the trial court granted grandmother's adoption petition "because of the extensive support group of relatives available to assist the grandmother").

### VII. Our Resolution of This Appeal

The judgment granting the foster mother's adoption petition is therefore reversed, and the case remanded to the trial court to vacate the orders granting adoption and denying custody, and to enter an order granting custody to the child's great-aunt.[20] See *In re L.L., supra*, 653 A.2d at 889–90.

*Reversed and remanded.*

---

18. We do not minimize the significance of this consideration. As we emphasized in *In re L.L.*, 653 A.2d at 884–86, the governing statute requires that the trial court give weight to the child's need for continuity of care, the emotional needs of the child, and the child's attachment to the foster mother. See D.C.Code § 16–2353(b) (1989). The same statute, however, requires the trial court to consider the child's interaction with others including parents and siblings. As noted in the text the great-aunt has raised T.J.'s sister for ten years and, as the trial court found, T.J. is "very attached" to the sister.

19. The trial judge's opinion evidences the strength of the competing considerations in his mind and his difficulty of decision. As we read his opinion, he invoked the preponderance standard, but would have himself ruled differently under the clear and convincing test we today hold applicable.

20. This conclusion is reached with the recognition that an initial order for child custody is always open to modification by the court where warranted by a change of circumstances affecting the child's best interest.