### In re F.N.B.

### A.H.B., Appellant.

### No. 96–FS–874.

District of Columbia Court of Appeals.

Submitted Dec. 4, 1997.
Decided Jan. 29, 1998.

---

**29**

Jo Ann Robinson, Interim Corporation Counsel, Charles L. Reischel, Deputy Corporation Counsel, and Sheila Kaplan, Assistant Corporation Counsel, filed a statement in lieu of brief for appellee District of Columbia.

Before TERRY, STEADMAN and FARRELL, Associate Judges.

STEADMAN, Associate Judge:

In *In re T.J.*, 666 A.2d 1, 11 (D.C.1995), we held that a parent's choice of a fit custodian must be given "weighty consideration" that can be overcome only by "clear and convincing evidence" that the proposed custodial relationship is "clearly contrary to the child's best interest." Before us is an appeal by the natural mother of F.N.B. from the trial court's termination of her parental rights, notwithstanding the mother's proposal that custody and, if necessary, adoption be awarded to her sister, who explicitly consented to the arrangement. We vacate the termination order and remand for further consideration.

### I.

F.N.B. was born on June 13, 1988 and resided in the care and custody of A.H.B. ("mother") until October 2, 1990, when a Metropolitan Police Department detective removed her. On October 25, 1990, A.H.B. signed a stipulation in which she admitted that her residence was not a safe, clean, and proper living environment for F.N.B., that she failed to keep current with immunizations for the child, and that she had a substance abuse problem. These admissions formed the basis for a neglect finding under D.C.Code § 16–2301(9)(B), (C) (1997). Between this adjudication and the present, F.N.B. has resided in temporary foster care, most recently with a Ms. Elaine Farley who has not expressed interest in adopting her.[1]

A.H.B. agreed that she would work toward reunification with F.N.B. by seeking drug treatment, submitting to periodic drug tests and a psychological assessment, attending parenting and vocational education courses, and maintaining regular contact with the child and a social worker. Between Novem-

---

Annie R. Alexander, Hyattsville, MD, appointed by the court, was on the brief for appellant.

Judith Katz, Washington,DC, appointed by the court, was on the brief for appellee F.N.B.

1. Although Ms. Farley is unwilling to adopt, Kenya Grant, a social worker with Lutheran Social Services, described F.N.B. as a "likable and adoptable child."

ber 1991 and April 1994, she spent time in various inpatient drug and alcohol treatment programs, attended several parenting classes, and took part in regular visits with F.N.B.

Against professional recommendations, A.H.B. left the treatment center and moved into a one-bedroom apartment.[2] Subsequently, she twice attempted suicide, had an alcohol relapse, discontinued drug testing, and ceased regular visitation with F.N.B. An April 26, 1995 psychological assessment concluded that A.H.B. did not possess the physical, mental, or emotional resources necessary to care for her daughter and recommended that the child remain in foster care.

The child's guardian ad litem, Judith Katz, applied for an order terminating parental rights in January 1996. In April 1996, the trial court conducted a two-day evidentiary hearing, taking testimony from A.H.B., her sister W.B., and Ms. Grant, the social worker, after which an order was issued terminating A.H.B.'s parental rights. An appeal was taken to this court and is now before us.

## II.

### A.

■■■ At the hearing, the mother's principal efforts were directed at establishing her present ability to care for F.N.B. However, the trial court carefully considered the six factors enumerated in D.C.Code § 16–2353(b) (1997) and explained in a lengthy opinion the grounds for terminating parental rights if the mother alone were taken into account. On that basis, despite appellant's arguments to the contrary, we would have no difficulty in affirming the trial court's order.[3]

However, at the hearing, the mother proposed an alternate arrangement for custody or eventual adoption. Specifically, on direct examination the mother testified as follows:

Q: Okay, and do you want your daughter returned to you?

A: Yes, I do.

Q: Okay. Do you want your daughter to be adopted by someone other than yourself and your family?

A: If it come to our (inaudible), I would rather have my sister adopt my daughter.

Q: Okay. Okay.

A: And she's right there, and she will say—she said she will do that for me.

Subsequently, the sister, W.B., testifying on behalf of A.H.B., confirmed the assertion that she would be willing to assume custody or adopt F.N.B.:

Q: Okay. Can you tell us whether or not you would be willing to be a foster parent for F.B.?

A: Yes, ma'am.

Q: Okay, and if it became necessary for you to adopt her, would you be willing to adopt F.B.?

A: Yes, ma'am.

However, in its memorandum and order terminating the mother's rights, the trial court appeared to place little weight on this testimony. In totality on the point, the court simply stated,

[W.B.], Respondent's maternal aunt, saw Respondent at [A.H.B.'s] apartment on the Sunday prior to this hearing and testified that she would be willing to care for Respondent if [A.H.B.] could not. No explanation was presented as to what this aunt's

---

**2.** She currently resides in the apartment with her husband, whom she married in 1995, and their two young children, F.N.B.'s half-siblings.

**3.** We review trial court decisions to terminate parental rights under the deferential abuse of discretion standard, reversing only if clearly erroneous. *In re A.R.*, 679 A.2d 470, 474 (D.C. 1996); *In re T.M.*, 665 A.2d 950, 952 (D.C.1995). The trial court has wide latitude in applying the statutory criteria of § 16–2353(b) to determine whether the best interests of the child, as shown by clear and convincing evidence, call for termination. *In re A.R., supra,* 679 A.2d at 474.

Here, the evidence, viewed in the aggregate, is quite compelling on the issue of A.H.B.'s fitness to care for her daughter. The record demonstrates that although she made efforts to follow through on her treatment and visitation commitments, such efforts were inconsistent and of limited success. Based upon A.H.B.'s history of neglect, caused by a combination of factors, and the showing that her progress and improvement have been, at best, slight, we sustain the court's holding that she is in no position to care for F.N.B.

role has been during the five plus years when three of [A.H.B.'s] children have been in foster care.

The mother, citing *In re T.J.*, argues that this limited treatment of her announced custody preference constituted reversible error.

### B.

*In re T.J.* was a dispute between a neglected boy's foster mother, who sought adoption, and his biological great-aunt, who petitioned for custody. 666 A.2d at 4. The boy's natural mother, clinically mentally ill, was deemed incapable by the trial court of caring for him, but there was no evidence she was incapable of making decisions for his welfare; she opposed the adoption, preferring that the great-aunt assume custody. *Id.* at 14. Both the foster mother and the great-aunt were found to be exemplary caretakers.

The trial court granted the adoption, holding that the harm associated with removing the child from his nurturing foster home, an environment in which he thrived, outweighed the advantages of being raised by his great-aunt. *Id.* at 16. We reversed, underscoring the right of the parent to choose her child's custodian unless deemed unfit or ineligible to do so. We declared:

> [U]nless it is established that the parent is not competent to make such a decision, a child and the natural parents share a vital interest in preventing erroneous termination of their natural relationship, and, therefore, a parent's choice of a fit custodian for the child must be given weighty consideration which can be overcome only by a showing, by clear and convincing evidence, that the custodial arrangement and preservation of the parent-child relationship is clearly contrary to the child's best interest.

*Id.* at 11. "The non-parent seeking adoption must carry that burden of proof." *Id.* at 16. Much of this holding was based on our recognition of the mother's "constitutional right[ ] to participate in decision-making relating to the rearing of her child without a formal finding that she has forfeited her right to do so." *Id.* at 14.

■ Although *T.J.* concerned adoption, its underlying rationale is equally applicable to termination of parental rights cases, *see In re Baby Girl D.S.*, 600 A.2d 71, 83–84 (D.C. 1991) (the availability of a fit family member willing to assume legal custody of the child is an important consideration in the court's decision whether to terminate the parent-child relationship), especially because the constitutional implications are close, if not identical. *See In re T.J.*, *supra*, 666 A.2d at 12.

While the case before us differs in certain significant respects from *T.J.*, it bears sufficient resemblance to give us serious pause at an affirmance on the record here. There, as here, the child's natural mother was determined to be incapable of caring for the child. There, as here, the natural mother had expressed a preference for a particular relative as a fit custodian for the child. There, as here, the trial court correctly applied the clear and convincing standard to the issue of the natural mother's own custody rights, but insufficiently considered the alternate arrangement proposed by the natural mother. *Id.* at 11. Indeed, in this case, unlike the strong contrary consideration in *T.J.*,[4] there is the added factor that in light of the present foster parent's disinterest in adoption, a change of custody seems inevitable in any event.

To be sure, in other respects the case before us is less compelling than *T.J.*, where we reversed the trial court outright. In *T.J.*, we noted the possibility that natural parents might "in some manner forfeit[ ] the right to direct the upbringing of their children." *Id.* at 14. The natural mother in *T.J.* was clinically mentally ill and for that reason alone found unable to care for her child.[5] In contrast, A.H.B.'s difficulties stem from a variety of causes, as indicated above. We do not preclude consideration upon remand of this issue and its impact upon the ultimate weight

---

4. The trial court in *T.J.* stressed the deep attachment that had developed between the child and the proposed adoptive mother, with whom he had resided for several years. 666 A.2d at 9.

5. We observed that the mother "had not been adjudicated as a mother who failed, voluntarily, to provide proper parental care." *In re T.J.*, *supra*, 666 A.2d at 10.

to be given her wishes respecting her child's custodian.

Furthermore, in *T.J.*, considerable evidence had been presented to demonstrate the fitness of the proposed custodian, a great-aunt of the child. The record in the case before us is skimpier in that regard, showing only that W.B. holds a full-time job as a lab technician. However, nothing in the present record suggests any unfitness of W.B., and under *T.J.* the burden in that regard would be on the party opposing the mother's choice. *Id.* at 16. The same may be said for concerns, apparently reflected in the trial court's comments, about W.B.'s actual willingness to undertake the necessary responsibility in the absence of any information "as to what the aunt's role has been during the five plus years."[6] Such concerns might in part be alleviated by requiring a formal petition for custody, as in *T.J.* Moreover, it is not difficult to imagine various acceptable explanations for any asserted deficiencies of the aunt in that regard, and here too *T.J.* suggests that the absence of concrete information noted by the trial court could be equally attributed to the party seeking the termination of parental rights. We note that an adopting parent in the circumstances here would have no greater contact with the child than W.B.

Finally, we do not mean to suggest that the trial court is precluded here from considering the desirability of an adoption, such as by W.B., in determining the ultimate best interests of the child, and in particular "the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home." D.C.Code § 16–2353(b)(1). *See In re T.M., supra* note 3. In this regard, however, such a determination made in a pre-termination context would reflect the mother's right to express a preference as to the adoptive parent. D.C.Code §§ 16–304, –2361(b) (1997).

All of these issues and any others the trial court may deem relevant in determining the best interests of the child are left open for further development and consideration on remand. The mother's choice here is not necessarily controlling. For example, in *In re T.M., supra*, a case decided after our decision in *T.J.*, we affirmed a trial court termination of a mother's parental rights over the mother's contrary proposal that custody be transferred to a great-aunt. 665 A.2d at 952. The child in question had spent most of her life with her godmother, who intended to adopt her. *Id.* at 951. The trial court also noted the relative absence of contact between the child and the great-aunt. *Id.* Furthermore, the natural mother proposed that custody be transferred to the great-aunt, but only as an interim caretaker. *Id.* The trial court in *T.M.* gave explicit consideration to the proposal of the mother but concluded that to uproot the child from her present family in the hope of some future ability of the mother to take custody was against the child's best interests, a conclusion that we affirmed on the facts of that case, expressly distinguishing *T.J. Id.* at 951–52 & n. 2.

■ The case before us is neither *T.J.* nor *T.M.* We are persuaded, however, that these precedents require some further exploration of A.H.B.'s proposal than was undertaken by the trial court here.

Accordingly, the order terminating appellant's parental rights is vacated and the case remanded for further proceedings consistent with this opinion.[7]

---

6. In *T.J.*, the mother relinquished the child to a foster home in April 1991, but the great-aunt did not express an interest in obtaining custody until July 1992, three months after the child had been placed with the competing foster mother. 666 A.2d at 4–5.

7. The trial court may, of course, take into account developments since the entry of the order appealed from.