955 A.2d 161 (2008)
In re A.B.; D.B., Appellant.
No. 07-FS-907.
District of Columbia Court of Appeals.
Argued June 24, 2008.
Decided August 21, 2008.
*163 Laurie P. McManus, for appellant D.B.
Catherine Ferrando, Assistant Attorney General, with whom Peter J. Nickles, Interim Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for appellee.
Joseph Barber, guardian ad litem, Washington, DC, filed a statement in lieu of brief for A.B.
Before RUIZ, Associate Judge, FARRELL, Associate Judge, Retired,[*] and KING, Senior Judge.
KING, Senior Judge:
Appellant D.B., the biological mother of A.B., appeals from the trial court's order terminating her parental rights. D.B. presents two issues for review on appeal. First, she argues that the evidence presented did not support the trial court's order terminating her parental rights. Specifically, she contends that the trial judge erred in finding that D.B. was mentally ill and thus unable to care for A.B., and that the trial judge improperly took into account her own observations of D.B.'s behavior in court. D.B. also argues that the trial judge failed to give weighty consideration to D.B.'s choice of a custodian.[1] We affirm.

I.

Background
A.B. was born on October 16, 2003, and was removed from D.B.'s care on November 28, 2005, as a result of an investigation into unexplained bruises on her right cheek. A neglect petition was filed on December 1, 2005, and shortly thereafter the case was assigned to Judge Cordero. D.B. entered into a stipulation on January 5, 2006, acknowledging that A.B. was a neglected child as defined by D.C.Code § 16-2301(9)(A)(i) (2008 Supp.). In the stipulation, the trial court set reunification as a goal and ordered D.B. to, among other things, attend parenting and anger management classes, undergo psychotherapy, and to take advantage of resources to which the Child and Family Services Agency (CFSA) referred her, including housing and job training. When A.B. was removed from D.B.'s care, J.J., A.B.'s maternal grandmother, was the only relative identified as a potential placement resource. J.J., however, was unable to care *164 for A.B. because she was caring for D.B.'s teenage son and a sick relative.
Lisa Emmi, the first social worker assigned to work with A.B. and D.B., testified that D.B. initially completed parenting and anger management classes, a psychiatric evaluation, and a partial psychological evaluation. However, D.B.'s interest in the services was "ever changing." At times, D.B. expressed interest in participating, but at other times, she was unable to understand why CFSA was involved at all. Toward the end of Emmi's work with D.B., D.B. became "a little bit more defiant about participation in services," refused the services in which she was required to participate, and exhibited bizarre behavior, such as talking to herself and wearing inappropriate clothing to visits. Emmi also testified that D.B.'s visitation was reduced from two three-hour visits per week to two two-hour visits because three hours proved "to be a bit long for D.B." In mid-January 2006, contact was reduced to one one-hour visit per week after D.B. had missed several visits. Based on Emmi's observations and D.B.'s failure to participate in services, Emmi recommended the goal of reunification be abandoned in favor of adoption or guardianship.
During Emmi's work with D.B., D.B. underwent a psychological evaluation conducted by Dr. Seth King to determine her ability to parent and to identify any cognitive limitations or mental health issues. Dr. King diagnosed D.B. with depressive disorder and testified that her scores on cognitive tests were "consistent with the level that is associated with mild mental retardation." Dr. King further testified that D.B.'s level of cognitive functioning impaired her ability to care for A.B.
Marie Ellis, a family preservation specialist at the Columbia Heights/Shaw Collaborative, supervised visits between A.B. and D.B. for most of the time Emmi was assigned to the case. Ellis testified that, during a typical visit, D.B. would bring snacks for A.B. and was affectionate with her. Ellis also testified, however, that D.B. failed to discipline A.B. when she engaged in inappropriate or dangerous behavior. When Ellis attempted to discipline A.B. or curb any dangerous behavior, D.B. reacted negatively, and Ellis testified that D.B. "did not like the redirection" or "feel that her child needed to be disciplined."
A second social worker, Kara Falck, was assigned to work with A.B. and D.B. in July 2006, and she continued working with them until December 2006. Falck testified that early in a visit, D.B. and A.B. were affectionate with each other; however, after the first thirty minutes or so, D.B. would typically disengage from A.B. As the visits continued, Falck testified that she became concerned about D.B.'s behavior, including D.B. talking to herself and disengaging from A.B. at earlier stages during the visits. On September 15, 2006, the trial judge suspended D.B.'s visitation with A.B. because D.B. physically threatened Falck in A.B.'s presence during a visit on September 13. In her order, the trial judge required D.B. to begin weekly individual psychotherapy and to provide written verification that she had completed a mental health assessment through the Department of Mental Health (DMH). Although Falck learned that D.B. had been to a DMH core service agency, she was unable to verify that D.B. participated in any services. After the September 13 incident, Falck only saw D.B. when she stopped at CFSA two or three times to request public transportation tokens. Based on her interaction with D.B., Falck, like Emmi before her, recommended that the goal be changed to adoption, which the court later approved. On November 6, 2006, the Office of the Attorney General *165 filed a motion for termination of parental rights (TPR).
D.B.'s and A.B.'s case was transferred to Linda Clausen, the third and final social worker, in mid-January 2007. She testified that the only face-to-face interaction with D.B. occurred when D.B. requested public transportation tokens. After that meeting, Clausen and another social worker contacted D.B. to encourage her to participate in court-ordered mental health services. Although D.B. never received mental health services from the providers recommended by CFSA, Clausen learned D.B. had been receiving medication management from another service provider but was not seeing a therapist. D.B.'s visits with A.B. resumed in June 2007, after Clausen provided the court with a copy of D.B.'s psychiatric intake assessment demonstrating that she had complied with the court's order to provide information to CFSA concerning her mental health needs and participation in mental health services.[2] Although D.B. would initially show affection towards A.B. during the three June visits that preceded the hearing on the TPR petition, which began on June 27, 2007, Clausen observed that D.B. would drift off and fail to properly supervise A.B. Clausen testified that D.B. "either [] doesn't give herself permission to be [a] mother, ... or she just doesn't do it."
In January 2007, while Clausen was assigned to the case, M.J., a maternal cousin, attended a permanency hearing and identified himself as a placement resource. M.J. visited with A.B. approximately ten times after he identified himself as a placement resource, but missed between two and four visits. Although M.J. at times engaged A.B., Clausen testified that A.B. did not appear to be attached to M.J. and at times "wasn't so playful with him." M.J. applied for clearances, and Clausen conducted a phone interview and a home assessment. Clausen testified that M.J. lived in a three-bedroom apartment with his wife and their four children. M.J.'s two daughters shared a small bedroom, while his two sons shared a larger room. M.J. and Clausen discussed other housing options, including moving into a larger apartment, which M.J. understood to be a possibility based on a conversation with his landlord. Ultimately, however, Clausen concluded there was no room for another child, and she testified that M.J. never told her about the conversation he had with his landlord. In addition to housing issues, M.J. was unable to provide documentation of his salary, and Clausen learned that CFSA followed up on an incident in 2003 when M.J. passed out at an event downtown while he was with his nephew and children. Further, a background check revealed that M.J. had prior convictions for possession of marijuana and firearms in 2000 and 2001.
In contrast to Clausen's testimony, M.J. testified that he and A.B. had grown close as his visits progressed. M.J. also testified that he took leave from school to pursue the required clearances and licensing necessary to care for A.B.[3] He further testified that his income was approximately $1200 per month but varied because it was based on commissions; that he and his family received food stamps; and that they lived in subsidized housing. Although M.J. said he had a close relationship with A.B., he also testified that he did not take any steps to visit A.B. before identifying himself as a placement resource, and in his *166 conversations with D.B., he never asked about A.B.
In her findings of fact and conclusions of law, the trial judge credited the testimony of all three social workers, Dr. King, and Ellis, the family preservation specialist. The trial judge also noted D.B.'s conduct during several other hearings over which the trial judge also presided. Specifically, she recalled that D.B. "repeatedly asked why her daughter was in the neglect system and why she had to get mental health services" and "was visibly agitated during hearings." The trial judge did not credit any of M.J.'s testimony and found it was "untrustworthy," noting many inconsistencies.

II.

A.
D.B. first argues the trial judge's termination of parental rights was not supported by clear and convincing evidence. Specifically, she contends the trial judge (1) improperly took into account her behavior at several hearings during the neglect and TPR proceedings, and (2) erred when she concluded D.B. was mentally ill and thus incapable of caring for A.B. We reject both claims.
"A trial court may terminate the parent-child relationship when it determines, on the basis of the evidence presented and after due consideration of the best interest of all parties, that the termination is in the best interest of the child." In re Tw.P., 756 A.2d 402, 407 (D.C.2000) (citations omitted). In determining whether to terminate parental rights, the trial court must consider (1) the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home; (2) the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child; (3) the quality of the interaction and interrelationship of the child with his or her parent, siblings, relative, and/or caretakers, including the foster parent; and (4) to the extent feasible, the child's opinion of his or her own best interests in the matter. D.C.Code § 16-2353(b).[4] The trial court's determination must be supported by clear and convincing evidence, which is defined as "the evidentiary standard that lies somewhere between a preponderance of evidence and evidence probative beyond a reasonable doubt." Id. (quoting In re J.M.C., 741 A.2d 418, 423 (D.C.1999)). We review the trial court's decision to terminate parental rights for abuse of discretion. Id.
In her oral findings of fact, as part of her evaluation of D.B.'s mental and emotional health, the trial judge took "judicial notice" that during the neglect proceeding, D.B. asked why A.B. was in the neglect system. The trial judge also noted that she observed behavior consistent with the testimony of witnesses who testified that D.B. was "decompensating and generally unstable." In her conclusions of law, the trial judge found "the mental health of [D.B.] is in serious doubt," and credited Dr. King's testimony as to D.B.'s "borderline ability to function as an adequate parental caregiver, both now and in the future." D.B. contends these findings were clearly erroneous and do not support the trial judge's conclusion that D.B. was "mentally ill."
At the outset, we note that a trial judge's own observations of a party's demeanor during court proceedings are not *167 generally characterized as judicial notice.[5] "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Christopher v. Aguigui, 841 A.2d 310, 311-12 n. 2 (D.C.2003) (quoting FED.R.EVID. 201(b)); see also BLACK'S LAW DICTIONARY 863-64 (8th ed. 2004) (defining judicial notice as "[a] court's acceptance, for purposes of convenience and without requiring a party's proof, of a well-known and indisputable fact; the court's power to accept such a fact"). Here, the trial judge who presided over the TPR proceeding also presided over hearings during the neglect proceedings, and she took into account her own observations of D.B.'s behavior during those proceedings. The trial judge found the social workers' testimony consistent with the judge's observations of D.B.'s behavior in court. Moreover, the trial judge explained that D.B. was at times "agitated" and "clearly was confused" when she attended hearings, asking why A.B. was placed in the neglect system. We know of no authority, and D.B. cites none, holding that the trial judge may not take such observations into account. On the contrary, in non-jury trials, it is within the province of trial judges to observe the demeanor of witnesses and to make credibility determinations, which inform the judges' decisions. See, e.g., Jenkins v. Strauss, 931 A.2d 1026, 1036 (D.C.2007). Similarly, charges for criminal contempt of court often arise from a trial judge's observations of a defendant's conduct in court. See, e.g., Fields v. United States, 793 A.2d 1260, 1265 (D.C.2002) (affirming conviction for contempt based on trial judge's conclusion that defendant stared at witnesses in attempt to intimidate them at civil protective order hearing).[6] Further, in In re Antj.P., 812 A.2d 965, 970-71 (D.C.2002), which involved a TPR proceeding, this court affirmed the termination of a father's parental rights, where the trial court drew adverse inferences from the father's failure to testify at the TPR hearing. We noted that the father had "peculiar knowledge concerning the nature of his relationship with his son;" however, since he failed to testify at the hearing, we could not "say that the trial court improperly drew an adverse inference as to his relationship with his son, where the controlling legal principle is `the best interests of the child.'" Id. at 971. Accordingly, we conclude that the trial judge here committed no error by factoring her own observations of D.B.'s behavior into her evaluation of D.B.'s mental and emotional health.[7]
*168 We also reject D.B.'s contention that the evidence presented failed to meet the standard required to support the trial judge's finding that D.B. was "mentally ill."[8] First, the trial judge never concluded that D.B. was "mentally ill." Rather, the trial judge found that D.B.'s mental health was "in serious doubt." In support of that conclusion, the trial judge cited her own observations of D.B. in court and the testimony of Dr. King, who testified that D.B. had a "borderline ability to function as an adequate parental caregiver, both now and in the future." The social workers' testimony also provided ample support for this conclusion. For example, Emmi testified that D.B. became "defiant" about participating in mental health services, and that D.B. talked to herself and at one point arrived to a visit wearing underwear on her head. Falck also noticed D.B. talking to herself, and D.B. physically threatened Falck in A.B.'s presence. Clausen testified that D.B. would "drift off" during visits and failed to properly supervise A.B. The trial court credited the social workers' testimony and concluded that their testimony confirmed Dr. King's conclusions. In light of the testimony concerning D.B.'s mental health and overall behavior, all of which the trial judge credited, we cannot say the trial judge erred in concluding that D.B.'s mental health was "in serious doubt" or abused her discretion in finding that termination of the parent-child relationship was in A.B.'s best interest.

B.
Finally, D.B. argues the trial judge failed to give weighty consideration to M.J., D.B.'s choice of custodian.[9] We also reject that contention.
"[A] parent's choice of a fit custodian for the child must be given weighty consideration which can be overcome only by a showing, by clear and convincing evidence, that the custodial arrangement and preservation of the parent-child relationship is clearly contrary to the child's best interest." In re F.N.B., 706 A.2d 28, 31 (D.C.1998); In re T.J., 666 A.2d 1, 11 (D.C.1995) (citing Santosky v. Kramer, 455 U.S. 745, 760, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). Here, the government clearly met its burden of overcoming the presumption in favor of placement with M.J. Although M.J. testified that he loved A.B., attended supervised visits with A.B., and could financially support her, Clausen testified to the contrary. Specifically, Clausen testified that M.J. missed visits, often canceling at the last minute, and that A.B. appeared disinterested in him during their visits. Clausen also testified that there was not adequate space for a fifth child in M.J.'s apartment, and M.J. was unable to provide any documentation of his salary despite his claim that he earned approximately $1200 per month. Moreover, a background check revealed prior convictions for drug possession and possession of a firearm. Finally, M.J. himself testified *169 that despite his monthly conversations with D.B. after A.B.'s removal, A.B. "didn't come up" in conversation, and he conceded that he failed to identify himself as a placement resource until over one year after A.B.'s removal.
The trial judge, "[h]aving observed his demeanor and carefully reviewed his testimony," found M.J.'s testimony untrustworthy. In her findings of fact, the trial judge highlighted the same inconsistencies outlined above. The trial judge also noted M.J.'s failure to comply with CFSA's prerequisites, as well as his prior convictions and the incident that required CFSA's response. The trial judge gave appropriate consideration to M.J. as D.B.'s preferred custodian and based her determination of M.J.'s own testimony and the testimony of Clausen, who observed M.J.'s interactions with A.B. and assisted M.J. in applying for the appropriate clearances to serve as a placement resource. In light of the evidence presented, we are satisfied the trial judge gave the necessary "weighty consideration" to M.J. as D.B.'s choice of a custodian. Accordingly, the trial court's decision terminating parental rights is
Affirmed.
NOTES
[*] Judge Farrell was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on July 1, 2008.
[1] In her reply brief and at oral argument, counsel for D.B. also asserted the change of goal from reunification to adoption within seven months after A.B. had been adjudicated neglected allowed too short of a period for social workers to work towards reunification. As the District underscored, however, it may file a motion to terminate parental rights when a child has been adjudicated neglected at least six months prior to the filing of the motion and when the child is in the court-ordered custody of a District agency or a guardian other than the parent. D.C.Code § 16-2354(b)(1) (2001).
[2] Clausen testified that the psychiatric intake assessment consisted only of questions required before a patient could receive treatment or prescriptions.
[3] M.J. testified that at the time he identified himself as a placement resource, he was pursuing a degree in mass media at the University of the District of Columbia.
[4] Because they are not relevant here, considerations regarding abandoned infants and evidence of drug-related activity have been omitted.
[5] Although we do not decide the case on this basis, we note that D.B.'s counsel at the TPR proceeding did not preserve this issue for review, because, despite the trial judge's direction that she do so, she failed to file a written motion citing authorities that would preclude the trial judge from taking into account her observations of D.B.'s conduct during earlier court proceedings.
[6] See also In re Vance, 697 A.2d 42, 45 (D.C. 1997) (affirming adjudication of summary contempt based on threatening manner of defendant's gestures); Bethard v. District of Columbia, 650 A.2d 651, 654 (D.C.1994) (trial judges may "punish criminal contempt summarily `if the judge certifies that the judge saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the Court'").
[7] D.B. argues that the different character of neglect and termination of parental rights proceedings makes it inappropriate for a judge in the latter to rely on her observations from the former. But, if anything, the statutory scheme invites such reliance by a judge at least in part, by requiring that successive Family Court proceedings involving the same individual "shall be assigned to the same judge or magistrate judge ... to the greatest extent practicable and feasible." D.C.Code § 11-1104(b)(2)(B). The judge's familiarity with the proceedings and the parties, including her ability to observe their comportment over time, is thus a positive value under the statute.
[8] Likewise, we find no merit in D.B.'s assertion that the trial judge concluded that D.B.'s visits with A.B. were harmful to A.B. The court's July 5, 2007, decision and order contains no mention of such a conclusion, and indeed, D.B. fails to cite any portion of the record to support this assertion.
[9] Although no witnesses testified that M.J. was D.B.'s choice of custodian, we presume D.B. preferred her daughter be placed with M.J., as she asserts this on appeal and did not challenge M.J.'s pursuit of the clearances required to serve as a placement resource.