19 A.3d 785 (2011)
In re Petition of R.E.S., D.F., Appellant.
No. 08-FS-451.
District of Columbia Court of Appeals.
Argued March 23, 2011.
Decided May 19, 2011.
*787 Laurie P. McManus, for appellant D.F.
Sharon A. Singh, filed a supplemental brief, for appellee R.E.S.
Stacy L. Anderson, Assistant Attorney General, with whom Irvin B. Nathan, Acting Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for the District of Columbia.
Alicia Barsoumian, Guardian Ad Litem for D.T., filed a supplemental brief.
Before GLICKMAN and FISHER, Associate Judges, and REID,[*] Associate Judge, Retired.
FISHER, Associate Judge:
This is the second time D.F. has come before this court in an effort to set aside a final decree granting R.E.S.'s petition to adopt his biological daughter D.T. without his consent. Following our remand for a hearing, D.F. now challenges the denial of his claim of ineffective assistance of counsel. We reject his contentions and affirm.

I. Background
D.T. was born in 1995 and removed from her mother L.B.'s care in 2001 due to allegations of neglect. Before then, D.F. was not aware of D.T.'s existence. Once a paternity test confirmed he was D.T.'s father, D.F. "wanted custody of D.T.[,]" but only visited her four times before he was arrested on drug charges. He pled guilty in October 2002, and soon thereafter was sentenced to prison, where he remained until May 2010.
D.T. resided in six different foster homes before March 1, 2006, when she was placed with R.E.S. A few months later, R.E.S. filed a petition to adopt D.T. Judge Dalton (then a Magistrate Judge) held a trial to determine whether the biological parents' consent to the adoption should be waived. R.E.S. and Linda Clausen, the social worker assigned to D.T.'s case, were the only witnesses who testified. D.T.'s guardian ad litem spoke in support of R.E.S.'s petition and she, R.E.S., and Ms. Clausen reported that D.T. wanted R.E.S. to adopt her. At the conclusion of the hearing, Judge Dalton found that L.B. and D.F. had abandoned D.T. and that it was in D.T.'s best interests to waive their consent to her adoption.[1] Judge Cheryl Long *788 affirmed the decision to grant R.E.S.'s petition.
When we first addressed this appeal, D.F. argued, among other things, that he had been denied the effective assistance of counsel. In re R.E.S., 978 A.2d 182, 185 (D.C.2009) (In re R.E.S. I). His ineffectiveness claim was based on his counsel's failure (1) to make arrangements for him to participate in the proceedings (he was still incarcerated at the time of the show-cause hearing), and (2) "to call any witnesses to support his preference that members of his family provide care for D.T." Id. at 194. We were unpersuaded by his independent arguments for a new adoption trial, but held that he had a statutory right to effective assistance of counsel, and remanded the record (not the case) for further inquiry concerning "the performance of his court-appointed counsel." Id. at 188-89, 195. In particular, we wanted to "know what the record would have looked like" if D.F. and his proposed caretakers had testified. Id. at 195. We also announced that the District of Columbia would apply the Strickland standard (tailored to fit the context) when evaluating claims that a parent has been deprived of the effective assistance of counsel in proceedings to terminate his or her parental rights. Id. at 191 (citing Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).
On remand, Judge Dalton (then an Associate Judge of the Superior Court) held a three-day evidentiary hearing for the limited purpose of determining whether appellant's counsel had been ineffective. The trial court heard testimony from D.F.; his trial counsel, Hope Umana; and his proposed caretakers-his sisters M.F.T. and B.J., his niece's mother G.A., and his fiancée B.S. Ultimately, the court rejected D.F.'s ineffectiveness claim, concluding that he had not satisfied the prejudice prong of Strickland.[2]
In the present case, the Court cannot find that the father was prejudiced nor is there a reasonable probability that if the father was present and the witnesses had testified that the decision of the Court would have been different. The respondent had been in foster care and numerous placements for years without permanency. The father was unavailable due to his incarceration and no family member had proceeded to permanency in any convincing manner.
D.F. argues that the trial court did not apply the correct standard when resolving his claim of ineffectiveness because it failed to give proper consideration to his preference that D.T. be placed with one of the caretakers he had proposed.[3] Appellant also claims that Judge Dalton abused her discretion when she did not permit him to call Ms. Clausen as a witness.

*789 II. Ineffective Assistance of Counsel

A. Legal Principles
Our review of a trial court's determination of whether counsel was ineffective "presents a mixed question of law and fact." Byrd v. United States, 614 A.2d 25, 30 (D.C.1992); Derrington v. United States, 681 A.2d 1125, 1132 (D.C.1996) (same). We "accept the trial judge's factual findings unless they lack evidentiary support in the record, and on those facts we will conduct a de novo review of the trial court's legal conclusions." Mercer v. United States, 864 A.2d 110, 118 (D.C. 2004) (citing Byrd, 614 A.2d at 30).
To establish a claim of ineffective assistance of counsel in termination proceedings, a parent must show both that counsel's performance was deficient and that actual prejudice resulted. In re R.E.S. I, 978 A.2d at 191 (citing Strickland, 466 U.S. at 687, 104 S.Ct. 2052). To demonstrate prejudice, a "parent must show `that counsel's errors were so serious as to deprive [him or her] of a fair trial, a trial whose result is reliable.' In other words, the parent must show a `reasonable probability' that, but for counsel's deficient performance, the outcome of the trial would have been different." Id. (quoting Strickland, 466 U.S. at 694, 104 S.Ct. 2052). Strickland defines a "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S.Ct. 2052.
While the Strickland test is familiar, there is an important difference in the prejudice inquiry when we are assessing the impact of counsel's performance in a termination proceeding instead of a criminal trial. "Unlike a criminal proceeding, which implicates the personal liberty interest of a criminal defendant, a termination proceeding involves more than a parent's fundamental liberty interest in the care, custody, and control of his child. The child's interests in stability, safety, security, and a normal family home are also at stake, as well as the prompt finality that protects those interests." John M. v. Arizona Dep't of Economic Security, 217 Ariz. 320, 173 P.3d 1021, 1025-26 (App.2007) (quotation marks and citations omitted). So, even though we are evaluating whether a parent's rights were violated, "in matters affecting the future of a minor child, the best interest of the child is the decisive consideration." In re M.L.P., 936 A.2d 316, 321 (D.C.2007) (citing In re L.W., 613 A.2d at 355). Parental rights "are not absolute, and must give way before the child's best interests." In re A.B.E., 564 A.2d 751, 754-55 (D.C.1989) ("The legal touchstone in any proceeding to terminate parental rights is the best interest of the child, and that interest is controlling.") (collecting cases).[4]

B. Analysis
Even if we assume, for the purpose of determining this appeal, that counsel's performance was deficient, D.F. still cannot prevail on his claim of ineffective assistance because he has not satisfied his burden of demonstrating prejudice.
Appellant's primary claim is that Judge Dalton's analysis of prejudiceher assessment of whether counsel's performance undermined confidence in the outcome of the adoption proceedingwas flawed because she failed to factor in the "weighty consideration" *790 principle. Here D.F. refers to our decisions which recognize that "unless it is established that the parent is not competent to make such a decision, ... a parent's choice of a fit custodian for the child must be given weighty consideration which can be overcome only by a showing, by clear and convincing evidence, that the custodial arrangement and preservation of the parent-child relationship is clearly contrary to the child's best interest." In re T.J., 666 A.2d 1, 11 (D.C.1995); In re F.N.B., 706 A.2d 28, 31 (D.C.1998) (same).[5] Appellant argues that because Judge Dalton's order did not explicitly articulate the "weighty consideration" principle or cite "let alone analyze"a parental preference case, it lacked "any reasoning to show how the father failed to carry his burden under this jurisdiction's body of parental preference case law[.]"
It is important to recognize that our "weighty consideration" cases do not "say that the parents' preferences are necessarily controlling." In re C.T., 724 A.2d 590, 598 (D.C.1999) (citing In re F.N.B., 706 A.2d at 32). We have "granted relief in [ ] cases [where] the trial court had not given sufficient consideration to the alternate custody arrangements proposed by the [parent]." In re Ja.J., 814 A.2d 923, 924 (D.C.2002); In re A.T.A., 910 A.2d at 297 (same). By contrast, in this case, "the fitness of [D.F.'s] proposed caretakers was the focal point of the trial and of the court's detailed findings of fact and conclusions of law." In re Ja.J., 814 A.2d at 924; In re A.T.A., 910 A.2d at 297 (same). Indeed, almost all of the evidence presented at the hearing on remand was directed toward this issue. Cf. In re F.N.B., 706 A.2d at 31-32 (insufficient consideration where the record lacked evidence of the potential custodian's fitness and her role in the child's life during the child's five years in foster care). Furthermore, the remand hearing does not stand in isolation. When reviewing Judge Dalton's initial order waiving D.F.'s consent to the adoption, Judge Long found that, contrary to the father's assertion,
the trial judge was careful to make findings about why the persons preferred by D.F. could not serve as custodians of the child as an alternative to adoption.... The father's preference for potential caretakers was most certainly not ignored. His wishes were neither ignored by the agency nor by the trial judge.... *791 The present case is a rather classic example of a parental preference that was rejected, by clear and convincing evidence, for all of the right reasons.
Judge Dalton's findings in her recent order also demonstrate that she thoroughly considered the evidence regarding D.F.'s preferred caretakers and explained in detail why they were not suitable placements for D.T. Cf. In re C.T., 724 A.2d at 598 ("[T]he court could not make any finding with respect to the [chosen caregiver] because it did not have any evidence addressing her fitness as a custodian for the children."). After carefully recounting and analyzing the proposed caregivers' testimony, Judge Dalton found:
There is no doubt from the testimony of [D.F.] and his relatives that this is a close-knit and loving family. However, as unfortunate as it may be, circumstances prevented his family from caring for [D.T.].... As well-intentioned as the family might have been, they failed to follow through with their initial attempts at placement. Either they did not qualify for placement, did not establish a relationship with [D.T.], did not maintain contact with [D.F.'s] attorney, or did not proceed to permanency.
On this record, we clearly cannot say that such factual findings lack evidentiary support in the record. See D.C.Code § 17-305(a) (2001).
The factors Judge Dalton referenced in her findings are precisely the sort of questions this court has considered when resolving similar claims. For example, she weighed D.T.'s relationship (more accurately, her lack of a relationship) with the proposed caretakers. See In re T.W.M., 964 A.2d at 598, 600, 604 (detailing long and extensive relationship that parent's proposed caregiver had with child); In re T.J., 666 A.2d at 5-8 (child had spent twenty-five weekends in great-aunt's home and "appeared, to various observers, to be comfortable" with her parents' preferred caretaker). The only contact M.F.T. and G.A. had with D.T. occurred during a few visits in 2003; thereafter, neither had any sort of relationship with her. See In re Ja.J., 814 A.2d at 924 (no error in declining to remove children from foster care and place them with mother's chosen caretakers where caretakers "had no relationship with [the boys] and had not seen them for several years"); In re B.J., 917 A.2d at 94 ("[P]lacement with a non-relative is clearly in the best interests of the children since they do not at this time have a substantial bond with any family members."); In re T.M., 665 A.2d 950, 952 (D.C.1995) (affirming TPR order despite mother's contrary proposal that custody be transferred to great-aunt with whom the child had had little contact).
The absence of attachment to a birth parent and his blood relatives is particularly relevant when compared to the loving bond that had been established during the year and a half D.T. lived with R.E.S. before the 2007 hearing. See, e.g., In re An.C., 722 A.2d at 40-41 (in children's best interests for foster mother to adopt them, rather than for court to place them with father's selected caregiver, where children had bonded with foster mother for nearly two years); In re A.T.A., 910 A.2d at 294-97 (affirming grant of foster mother's adoption petition despite parent's preference for relative's adoption petition where children had lived with foster mother for about a year before relative met children or filed competing petition). The "bonding[ between D.T. and R.E.S.] is now a fact of life[,]" In re An.C., 722 A.2d at 40, and Judge Dalton was intimately familiar with the details of their relationship. In fact, at the time of the hearing on remand, D.T. had been living with R.E.S. for approximately four years.
*792 Similarly, Judge Dalton permissibly considered the relatives' lack of follow through in qualifying themselves to assume responsibility for D.T. See In re R.E.S. I, 978 A.2d at 195 ("It may also be true that appellant's family members did not follow through on what they needed to do in order to qualify to assume custody of D.T."); In re Ja.J., 814 A.2d at 924 ("The court meticulously weighed the proposed caretakers' uncertain levels of commitment, inadequate or doubtful qualifications and abilities, and lack of preparedness to serve as stable surrogate parents against the particular needs of [the children.]"). Here, none of the custodians preferred by D.F. filed any kind of legal paperwork such as guardianship, custody, or adoption papers regarding D.T. Cf. In re T.W.M., 964 A.2d at 599 (parent's preferred caretaker had filed competing custody petition); In re T.J., 666 A.2d at 11 (same). In fact, by 2007, M.F.T. still had not contacted the social worker to complete the requirements for placement, and additional barriers to placement with G.A. had emerged.[6]See In re A.B., 955 A.2d 161, 168-69 (D.C.2008) ("The trial judge also noted [the potential caregiver's] failure to comply with CFSA's prerequisites[.]"). Accordingly, the opportunity to testify in 2007 would not have changed the fact that neither M.F.T. nor G.A. was in a position to promptly assume custody of D.T.
D.F. attempts to blame his relatives' passivity in their quest for custody of D.T. on Mr. Umana's lack of consistent follow-up. Appellant argues that Mr. Umana "never helped them overcome obstacles" in becoming caretakers as he "did nothing to educate [them] about the foster care system" and did not continually check to see if their circumstances had changed after the social worker initially rejected them as placement alternatives. This argument should not obscure the fact that the trial court appropriately considered the relatives' own lack of initiative and their failure to invest effort in forging and securing a bond with D.T. See In re An.C., 722 A.2d at 40-41 (father's preferred caregiver "had demonstrated little or no initiative, and she was in no position to provide the three children with a permanent home"; when the paternal grandmother "was free to initiate requests for visits directly with [the foster parent] she took no initiative"the foster parent called her and "proposed several Saturday visits which did occur[,]" but the grandmother "never requested more") (emphasis added). Here, M.F.T. stopped visiting D.T. in 2003 because of her work schedule and admitted that when her schedule changed, she did not "make any efforts to contact the social worker to start visiting again with [D.T.]" G.A. testified that after only two visits in 2003, she did not see D.T. again because, "No one ever contacted me." They also did not arrange to send D.T. letters, cards, or gifts.
Furthermore, Mr. Umana had no control over the various personal and financial obstacles *793 M.F.T. and G.A. experienced in their early attempts to qualify as placements. As years passed and aspects of their circumstances improved, neither one told counsel, nor did they request reconsideration by Ms. Clausen. See In re B.J., 917 A.2d at 94 (court considered that preferred custodian "took no steps to take custody of the children" during their six years in foster care).[7]
The trial court also properly noted that, before living with R.E.S., D.T. "had been in foster care and numerous placements for years without permanency." If the trial court had approved one of the father's selected caretakers in 2007 (after D.T. had been living with R.E.S. for about a year and a half), that relocation would have, among other detrimental effects, further delayed D.T.'s development of a sense of permanency. See In re An.C., 722 A.2d at 41 ("The TPR judge could properly conclude that if the parental rights of the father and the mother were not terminated, the children's future would be completely unsettled, and they would have to `wait and see' whether placement with a blood relative could be arranged at some unspecified time in the future."); In re T.M., 665 A.2d at 951-52 (citing with approval trial judge's concern that uprooting child from her "home and family of three years and plac[ing] her with an aunt with whom she has had little contact" in the hope that some day her mother could resume caring "for her would be contrary to her interests in continuity of care and caretakers and [would] defeat [her] well-founded integration into the stable [] home she currently enjoys"). Even if D.F. had made it clear in 2007 (as he now asserts), that he was willing to have his relatives assume permanent custody of D.T.,[8] the trial court could not have accurately predicted whether they would become licensed or would file an adoption petition. As a result, we are not convinced there is a reasonable probability that, if the court had heard from D.F. and his witnesses in 2007, it would have denied the adoption in favor of keeping D.T. in limbo so that one of the relatives could begin the lengthy process of trying to assume permanent custody of D.T. See D.C.Code § 16-831.02(a)(1)(A)-(B) (2010 Supp.).[9]
Based on these well-supported findings, we are satisfied that careful consideration was given to D.F.'s choice of caretaker. Nevertheless, there was ample evidence that placing D.T. with one of them would *794 not have been in her best interest. When reviewing D.F.'s claim that he was prejudiced by the performance of his counsel, we cannot "lose sight of the principle that governs in this contextthe best interest of the child." In re R.E.S. I, 978 A.2d at 192; see In re C.A.B., 4 A.3d 890, 899 (D.C.2010) ("[I]t is the child's best interest, not the fundamental right to parent, that is paramount in adoption cases."). And this court has cautioned, "it is generally contrary to a child's best interest `to take [her] out of a loving home, when she ha[s] lived [there] for a substantial period of time as a result of her biological parents' inability or unwillingness to care for her.'" In re An.C., 722 A.2d at 41 (quoting In re L.L., 653 A.2d 873, 883 (D.C.1995)); In re R.E.S. I, 978 A.2d at 192 (same). In this case, Judge Dalton heard extensive testimony that D.T. was "thriving" physically, academically, and socially under R.E.S.'s care. In fact, Ms. Clausen, who had worked on D.T.'s case since 2001 and had visited her thirty times since her placement with R.E.S. in March 2006, testified: "[I]t almost brings tears to my eyes" to describe her "extraordinary evolution[.]"
In sum, the trial court properly applied the Strickland standard for assessing a claim of ineffectiveness. None of the alleged shortcomings of counsel described above undermines our confidence in the outcome of the proceedings. Therefore, D.F. suffered no prejudice within the meaning of Strickland.

III. The Social Worker
D.F. alleges that in 2003, Ms. Clausen improperly "rejected [G.A. as a possible placement] because she was not a relative" and that this misstep requires a new adoption trial. Appellant's argument is based on the fact that, at the adoption trial, Ms. Clausen twice mentioned that G.A. was not a relative.[10] We do not perceive either reference to G.A.'s status to be an explanation of why Ms. Clausen did not place D.T. with G.A. Even D.F.'s current counsel stated on remand that Ms. Clausen's report indicated she had three reasons for "why [G.A.] wasn't suitable": her "home was too small[,]" she "would need time to consider adopting D.T.[,]" and she had a "schedule that wouldn't allow her to be home at supper time." When appellant's counsel asked Mr. Umana if G.A.'s status as a non-relative was a reason for Ms. Clausen rejecting G.A. as a placement option, he insisted the issue was a "red herring." Mr. Umana testified that the actual problems were G.A.'s housing and her lack of a bond with D.T.[11]
*795 D.F. also argues that the trial court abused its discretion when it ruled that he could not call Ms. Clausen as a witness at the hearing on remand. He wanted to challenge her initial basis for rejecting G.A. and show that, years later, she did not recontact G.A. or M.F.T. to see if their circumstances had changed. According to appellant, "[h]ad [Ms. Clausen's] credibility been impeached [at the 2007 hearing], clearly the outcome of the adoption hearing would have been different."
Ms. Clausen had already testified at the adoption trial, and Mr. Umana cross-examined her about these topics. In his closing argument, he challenged Ms. Clausen's reasons for rejecting G.A., "an approved foster parent connected with this family, [and] recommended by Mr. [D.]F.[,]" and asserted that Ms. Clausen "had basically taken the position that [she would not] work with" the relatives. In response to appellant's request to cross-examine Ms. Clausen again at the remand hearing, Judge Dalton reasoned that "the Court of Appeals has been clear in [analyzing] Strickland" that "we're not using hindsight to go back and say Mr. Umana should have asked, you know, the following 15 questions."
On this record, we cannot say that Judge Dalton abused her discretion in declining to permit D.F.'s new counsel to question Ms. Clausen. See (James) Johnson v. United States, 398 A.2d 354, 367 (D.C.1979) (a trial court has not abused its discretion unless "the exercise of discretion was in error and ... the impact of that error requires reversal") (emphasis added). Even if appellant's current counsel could have shown that Ms. Clausen should have been more receptive to G.A.'s candidacy in 2003, we are not persuaded that, in 2007, Judge Dalton would have severed the strong bond between R.E.S. and D.T. described above.[12]
Moreover, there would have been limited utility in allowing appellant's current counsel to renew the attack upon Ms. Clausen. We have previously cautioned that the child "cannot be punished for the alleged wrongs of the bureaucracy." In re T.M., 665 A.2d at 952 n. 3; In re L.L., 653 A.2d at 882 ("[T]he best interest of the child[ ] may compel [terminating] parental rights regardless of the defaults of public agencies."). Judge Dalton properly focused upon the qualifications of M.F.T. and G.A. (or the lack thereof) and the strong bond between D.T. and R.E.S.

IV. Conclusion
Appellant failed to demonstrate that he suffered prejudice due to his counsel's performance, or that he is otherwise entitled to a new adoption trial. The judgment on appeal is hereby
Affirmed.
NOTES
[*] Judge Reid was an Associate Judge of the court at the time of argument. Her status changed to Associate Judge, Retired, on April 7, 2011.
[1] The trial court may waive parental consent to a proposed adoption if it determines that consent is being withheld contrary to the child's best interest or if the parent has abandoned the child. In re N.N.N., 985 A.2d 1113, 1124 (D.C.2009); D.C.Code § 16-304(d)-(e) (2001). The adoption effectively terminates the natural parent's legal interest in his or her child. In re L.W., 613 A.2d 350, 356 (D.C. 1992).
[2] Judge Dalton did not decide whether Mr. Umana's performance was deficient. A court need not address the deficient performance prong of Strickland if it can dispose of the ineffectiveness claim based on lack of prejudice alone. Thomas v. United States, 748 A.2d 931, 938 (D.C.2000) (citing Strickland, 466 U.S. at 697, 104 S.Ct. 2052); see Brown v. United States, 934 A.2d 930, 943 (D.C.2007) (same is true for reviewing court).
[3] D.F. challenges Judge Dalton's findings with respect to only two of his four preferred custodiansM.F.T. and G.A. L.B. (D.T.'s biological mother) has not challenged the order granting adoption.
[4] To be sure, parents have a fundamental liberty interest in the care, custody, and control of their children. See Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). However, parental rights are neither absolute nor unconditional. See Lehr v. Robertson, 463 U.S. 248, 261-62, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983); Caban v. Mohammed, 441 U.S. 380, 392, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979).
[5] The "holding in T.J. is premised on the notions that natural parents ... do not lose their constitutionally protected interest in influencing their child's future `simply because they have not been model parents or have lost temporary custody of their children.'" In re T.W.M., 964 A.2d 595, 602 (D.C.2009) (quoting In re T.J., 666 A.2d at 11-12). This case, however, does not involve merely a "temporary" loss of custody or an appellant who has fallen short of being a "model" parent. Rather, D.F. is a parent in a biological sense only. He has never provided care for D.T., and it is not clear that he is qualified to make a decision about her best interests.

Although we have said that parents do "not forfeit[] their right to choose a caregiver for [their child] merely because they were unfit to personally parent the child[,]" In re T.W.M., 964 A.2d at 603, we have also recognized that a parent's chosen caretaker "should not be afforded the same weighty consideration where the neglected child had been in the custody of foster care for a considerable length of time before the biological parent demonstrated any interest in exploring possible familial placement options." In re A.T.A., 910 A.2d 293, 297 n. 4 (D.C.2006) (citing In re An.C., 722 A.2d 36, 40-41 (D.C.1998)); In re B.J., 917 A.2d 86, 93-94 (D.C.2007) (same). As in In re A.T.A., our "record does not indicate that [the parent] was derelict in exploring family members who could be potential caretakers[,]" but, as we explain below, it does show he "could not find any family member who [was ready, willing, and able] to adopt the [child]. Given our disposition of this appeal, we find it unnecessary to decide the extent to which our holding in In re An.C. is applicable here." 910 A.2d at 297 n. 4.
[6] D.F.'s sisters (including M.F.T.) initially "agreed that they each would complete the training and assessments" and Ms. Clausen "followed through with the sisters and assessed [] their homes, and their situations.... However, the sisters made appointments to attend orientation and training, and then cancelled[,]" and "never completed" the application.

In 2007, the foster care agency through which G.A. was licensedthe National Center for Children and Families (NCCF)was investigating allegations of physical abuse of a foster child in her care. NCCF had restricted her license so she could not have children under the age of thirteen placed with her. (D.T. was eleven years old at the time.) Even if these circumstances would not have strictly precluded CFSA (or the court) from placing D.T. with G.A., they hardly enhanced G.A.'s qualifications vis-a-vis R.E.S.
[7] D.F. alleges that Mr. Umana "violated many of the CCAN [Counsel for Child Abuse and Neglect] Standards in his dealings with the relatives" as he did not fully explain the relatives' legal options to them. In R.E.S. I we acknowledged that it would be "instructive" to consult the CCAN Standards, but we cautioned that judges should not follow a checklist when evaluating counsel's performance. 978 A.2d at 191-92 & n. 7. Moreover, if one of the relatives had filed an adoption petition, the Superior Court would have appointed an attorney for her. See D.C.Code § 16-2304(b)(1) (2001). Finally, Judge Dalton found that, among other things, Mr. Umana "had advised the relatives concerning the legal requirements to be licensed for placement and had encouraged them to visit and pursue placement of the respondent."
[8] In a letter to the court in September 2007, and at the hearing on remand, D.F. said his intent was for his proposed caretakers to assume custody of D.T. only until he was released from prison, at which point he would raise her.
[9] The "wait and see" approach of "indefinitely deferring adoption or termination of parental rights (leaving a child in `legal limbo' for the foreseeable future) is inappropriate where [the likelihood of a different option succeeding] within a reasonable time is entirely speculative." In re J.G., 831 A.2d 992, 1001 (D.C. 2003).
[10] First, R.E.S.'s counsel asked Ms. Clausen if D.F. or his sisters identified other possible placements for D.T. and, if so, who. Ms. Clausen said, "[M.F.T.] identified a G.A., who wasn't a relative but she was a paramour of [D.T.'s] uncle." (Counsel then asked what Ms. Clausen did to investigate the recommendation and whether Ms. Clausen placed D.T. with G.A.) On cross-examination, Mr. Umana pointed out that Ms. Clausen did not place D.T. with G.A. even though G.A. was "a registered and approved foster parent[.]" Ms. Clausen explained that she assessed G.A.'s home and decided it "was not big enough" for D.T. G.A. told Ms. Clausen that she would be moving but did not know exactly when. Ms. Clausen felt D.T. "[n]eeded a placement, and there was no room in [G.A.'s] house." Thereafter, she followed up but "there was nothing from [G.A.] saying that anything had happened about moving, and [ ] nothing ever happened. She was not a relative."
[11] As appellant notes, G.A. testified that Mr. Umana told her Ms. Clausen rejected her as a placement "because she was not a blood relative." The trial court, however, credited Ms. Clausen's testimony that G.A.'s home was too small for another child. Moreover, Judge Dalton explicitly stated that she "gives little if any weight to much of [G.A.'s] testimony." In particular, Judge Dalton found G.A.'s testimony that she was not and had not been residing with D.F.'s brother (who has a felony conviction and was not on her foster care license) "not credible due to inconsistencies and discrepancies with other witness testimony [specifically, the testimony of M.F.T.] and due to her demeanor on the witness stand as well as her exhibits." It was also "readily apparent to the Court that [G.A.] was not truthful" because her testimony "denying the restrictions on her license was rebutted by Ms. Catanzaro, a division manager of adoption and foster care services at NCCF, who testified" at the hearing on remand.
[12] It also appears that appellant has unfairly criticized Ms. Clausen. Judge Dalton noted D.F.'s allegation that Ms. Clausen was biased against his family, but concluded "[t]here is no indication of any bias from the credible witnesses. The social worker fulfilled her obligations to investigate the proposed placements and advise them of their responsibilities in order to have the child placed with them."