*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-FS-406

IN RE D.M.;

T.M., APPELLANT.

Appeal from the Superior Court
of the District of Columbia
Family Court
(188-TPR-07)

(Hon. Lloyd U. Nolan, Jr., Magistrate Judge)
(Hon. Jennifer DiToro, Reviewing Judge)

(Argued January 30, 2014                    Decided March 13, 2014)

*Madhavan K. Nair* for appellant T.M.

*Jon S. Pascale* for appellant T.P. filed a statement in lieu of brief in support of appellant T.M.

*Charmetra L. Parker*, Assistant Attorney General, with whom *Irvin B. Nathan*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, and *Donna M. Murasky*, Deputy Solicitor General, were on the brief, for appellee District of Columbia.

*R. Michael Labelle*, guardian ad litem, for appellee D.M.

Before GLICKMAN and EASTERLY, *Associate Judges*, and FERREN, *Senior Judge*.

GLICKMAN, *Associate Judge*: T.M., the biological mother of D.M., appeals the termination of her parental rights. She contends that the magistrate judge erred by failing to give weighty consideration to the third-party custodial arrangement she proposed as an alternative to the termination of her parental rights, and that there was insufficient evidence that termination was in D.M.'s best interest. Although we are not persuaded by the latter claim, we agree that the magistrate judge did not discuss T.M.'s proposed custody arrangement in enough detail to demonstrate that it received the weighty consideration our cases require. Accordingly, we vacate the judgment of the Superior Court and remand this case for further evaluation of T.M.'s alternative custody proposal, and for such other proceedings as may be appropriate in the light of changed circumstances.

**I.**

D.M was born on January 14, 2000, to T.M., his biological mother, and T.P., his biological father. On June 19, 2007, D.M. was committed to the care of the Child and Family Services Agency ("CFSA") following T.M.'s stipulation that she was unable to care for him herself due to her incarceration and that she had not designated another person to care for him in her absence.

The original goal of D.M.'s commitment was for him to be reunited with his biological mother. Eventually, however, on account of T.M.'s persistent drug dependency, which caused cognitive deficits and hampered her capacity for rational decision-making, and T.M.'s inability to complete court-mandated parenting classes and therapy, the goal changed to adoption. On March 26, 2010, the District of Columbia moved to terminate the parental rights of both T.M. and T.P.[1] The hearing on that motion commenced in late 2011.

In the course of the hearing, T.M. testified that she wished to resume her parental role and have D.M. live with her, but if that were not possible, she wanted her son to live with her mother-in-law, T.M.2.[2] T.M.2, who did not know D.M. well,[3] testified that she nonetheless was interested in becoming a foster parent for him, even after she learned about his special needs and behavioral issues. To that end, she testified, she had completed foster parenting classes, undergone a home study, and been licensed as a foster parent by the relevant agency in Virginia

---

[1] Although, for a period of time, T.P. had expressed an interest in reuniting with D.M., by the time of trial he had (to quote the order of the magistrate judge) "seemingly disappeared" from T.M.'s life.

[2] T.M. further testified that she would consent to D.M.'s adoption by T.M.2.

[3] She recalled having met him only once, when he was a young child.

(where she resided). T.M.2 expressed a willingness to adopt D.M. if CFSA recommended it.

CFSA, however, did not support T.M.2's candidacy as a suitable placement for D.M. Michael Carr, an adoption recruitment social worker with CFSA, testified that the placement team doubted T.M.2's ability to care for D.M. in view of his special needs and challenging behavior,[4] T.M.2's demanding work schedule, and the minimal supervision that would be available to D.M. in her absence.[5] Carr testified, moreover, that despite D.M.'s age, special needs, and serious behavioral issues, he was still adoptable; he had seen children with similar characteristics find permanent adoptive placements.

---

[4] It was noted that T.M.2 had indicated in a "matching" questionnaire that she would hesitate to care for a child with suicidal ideation or a problem with head-banging. T.M.2 testified that she still desired to care for D.M. after she learned that he had both those issues, but the CFSA social workers felt that she minimized the seriousness of D.M.'s troubling behavior and difficulties.

[5] At the time of the hearing, T.M.2's job at the Department of Corrections required her to be at work from 12:30 p.m. to 9:00 p.m., and her commute was an hour and a half each way. T.M.2 testified that she would be able to change her schedule so that she could work from 5:00 a.m. to 1:30 p.m. She anticipated that her 23-year-old son would be available to supervise D.M. when she was not at home.

The magistrate judge orally granted the District's motion on May 1, 2012, and issued written findings of fact and conclusions of law on September 20, 2012. He determined "by clear and convincing evidence that it is in [D.M.]'s best interest to terminate the rights of his biological mother and father." Only T.M. sought review of that decision. The reviewing judge in Superior Court affirmed it, and T.M. timely appealed to this court.

## II.

In conducting our review of a decision to terminate parental rights, a determination committed in the first instance to the trial court's discretion,[6] "we are mindful that from a procedural standpoint, our role is to review the order of the trial judge, not the magistrate judge."[7] However, as this court has stated, "we do not believe our powers of appellate review are so limited that, in reviewing the trial court's final order we may not look to the findings and conclusions of the fact finder on which that ruling is based."[8] Rather, "we review the magistrate judge's

---

[6] *See In re Baby Boy C.*, 630 A.2d 670, 683 (D.C. 1993).

[7] *In re C.L.O.*, 41 A.3d 502, 510 (D.C. 2012) (citation, alterations, and internal quotation marks omitted).

[8] *Id.* (citation omitted).

factual findings as the findings of the trial judge and review for abuse of discretion or a clear lack of evidentiary support."[9]

T.M.'s strongest claim is her contention that the magistrate judge did not properly evaluate her preference for T.M.2 to have custody of D.M. Because "a child and the natural parents share a vital interest in preventing erroneous termination of their natural relationship," we have mandated that "a parent's choice of a fit custodian for the child must be given weighty consideration which can be overcome only by a showing, by clear and convincing evidence, that the custodial arrangement and preservation of the parent-child relationship is clearly contrary to the child's best interest."[10] In other words, a parent, whose parental rights are still intact, has the right to propose a custodial arrangement, which may include not only adoption but also placement of the child with someone else while the

---

[9] *Id.* (internal quotation marks omitted).

[10] *In re T.J.*, 666 A.2d 1, 11 (D.C. 1995); *see also In re T.W.M.*, 18 A.3d 815, 819 (D.C. 2011) ("Where the parents have unequivocally exercised their right to designate a custodian, the court can terminate the parents' right to choose only if the court finds by clear and convincing evidence that the placement selected by the parents is clearly not in the child's best interest.") (internal citations and quotation marks omitted); *In re F.N.B.*, 706 A.2d 28, 31 (D.C. 1998) ("[T]he availability of a fit family member willing to assume legal custody of the child is an important consideration in the court's decision whether to terminate the parent-child relationship.") (citing *In re Baby Girl D.S.*, 600 A.2d 71, 83–84 (D.C. 1991)).

biological parent retains residual rights,[11] and the court must give weighty consideration to such an alternative before terminating the parent's rights. This requirement, we have held, applies in connection with a petition to terminate parental rights whether or not a custody or adoption petition has yet been filed or is pending.[12]

As the District notes, this court has, in dictum, construed its decision in *In re An.C.*[13] to mean that "a biological parent's choice of related caretakers should not

---

[11]  *See* D.C. Code § 16-2301(22) ("The term 'residual parental rights and responsibilities' means those rights and responsibilities remaining with the parent after transfer of legal custody or guardianship of the person, including (but not limited to) the right of visitation, consent to adoption, and determination of religious affiliation and the responsibility for support."). Foster care, third-party custody, and permanent guardianship are three different forms of child placement that are not incompatible with the maintenance of a biological parent's parental rights. *See* 29 DCMR § 6000 *et. seq.* (foster care); D.C. Code § 16-2381 *et seq.* (permanent guardianship); D.C. Code § 16-831.01 *et seq.* (third-party custody).

[12]  *See In re F.N.B.*, 706 A.2d at 31 ("Although *T.J.* concerned adoption, its underlying rationale is equally applicable to termination of parental rights cases . . . especially because the constitutional implications are close, if not identical.") (internal citations omitted); *see also In re A.B.*, 955 A.2d 161, 165 (D.C. 2008) (applying *T.J.* standard in a termination-only hearing, where alternative caretaker identified himself during a permanency hearing as a placement resource); *In re B.J.*, 917 A.2d 86, 89 (D.C. 2007) (applying *T.J.* standard where alternative caretaker testified during termination of parental rights hearing that she would consider adopting or filing for guardianship of the children).

[13]  722 A.2d 36 (D.C. 1998).

be afforded the same weighty consideration where the neglected child had been in the custody of foster care for a considerable length of time before the biological parent demonstrated any interest in exploring possible familial placement options."[14] But the court did not say this in *An.C.*, and if this dictum is understood to state a categorical exception to the rule that a biological parent's choice of a fit custodian is entitled to weighty consideration in a termination of parental rights proceeding, neither *An.C.* nor any of our subsequent cases supports it, and it is not correct. "It is important to recognize that our 'weighty consideration' cases do not say that the parents' preferences are necessarily controlling."[15] Our opinion in *An.C.* simply made clear that, while a natural parent's preference for a fit custodian deserves weighty consideration (which it received in *An.C.*), the parent's tardiness in expressing that preference legitimately may count against it when the delay allowed the children to develop a strong bond with a fit foster caregiver who wishes to provide a permanent home for them.[16] In *A.T.A.* and the other cases cited

---

[14] *In re A.T.A.*, 910 A.2d 293, 297 n.4 (D.C. 2006) (citing *In re An.C.*, 722 A.2d at 40-41); *see also, e.g.*, *In re K.D.*, 26 A.3d 772, 781-82 n.10 (D.C. 2011); *In re R.E.S.*, 19 A.3d 785, 790 n.5 (D.C. 2011); *In re B.J.*, 917 A.2d at 93-94. In each of these cases, beginning with *In re A.T.A.*, the stated proposition, supposedly originating in *In re An.C.*, was dictum. *See infra*, footnote 17.

[15] *In re R.E.S.*, 19 A.3d at 790 (internal quotation marks omitted).

[16] *See In re An.C.*, 722 A.2d at 41 ("Although, as we held in *T.J.*, the wishes of a fit parent as to the custody of his or her child constitute an important factor in

*(continued…)*

in footnote 14, *supra*, the trial court properly gave great weight to the biological parents' belatedly announced preference before finding it overcome by clear and convincing evidence of the children's best interests, and on appeal this court did not hold that the weighty consideration was unnecessary.[17] We have never upheld a trial court's failure to give weighty consideration to a parental preference on account of parental dilatoriness; nor has this court ever held that weighty consideration was unnecessary because the parent waited too long to propose a

---

*(continued…)*
the judge's calculus, the TPR judge could rationally find, and she did find, that in this case the father's statement of preference came far too late, that the proposed alternative placements were unrealistic, and that further delay would be detrimental to the children's well-being.").

[17] *See In re K.D.*, 26 A.3d at 781-82 n. 10 ("declin[ing] to apply the principle that a biological parent's choice of related caretakers should not be afforded the same weighty consideration where the neglected child had been in the custody of foster care for a considerable length of time before the biological parent demonstrated any interest in exploring possible familial placement options" where the natural parent was not "derelict in locating other family members to adopt the child," and her choice was entitled to receive and did receive weighty consideration); *In re R.E.S.*, 19 A.3d at 790 n.5 (same); *In re B.J.*, 917 A.2d at 94 ("[T]he trial judge carefully considered whether placement with Le.J. would be in the best interests of B.J. and Br.J., and we are satisfied that, however weighty the consideration to be given to L.J.'s desire that Le.J. be permitted to care for B.J. and Br.J., there was ample evidence that placement with Le.J. would not have been in the children's best interests."); *In re A.T.A.*, 910 A.2d at 297 ("Based on the trial court's detailed findings, we find the great weight given to T.H.'s choice of caretaker was overcome by the best interests of the twins.").

custody arrangement.[18]   At most, we now make clear, dilatoriness is simply a factor to be considered as part of the weighty consideration that is due.

We are constrained to say that the requisite "weighty consideration" and justification for overriding T.M.'s preference do not appear on the face of the magistrate judge's order in the present case.  The order contains no finding that T.M.2 is unfit to care for D.M. or that it would be contrary to D.M.'s best interest to place him in T.M.2's care.[19]  Indeed, there is no discussion at all of T.M.2 in the section of the order setting forth the magistrate judge's conclusions of law, nor any explicit recognition of the "weighty consideration" requirement. The reviewing

---

[18]   *Cf. In re C.L.O.*, 41 A.3d 502, 512 (D.C. 2012) (not deciding whether, in a contested adoption proceeding, clear and convincing evidence is required to override the opposition and waive the consent of a fit, unwed, noncustodial father who has failed to seize his opportunity interest in developing a custodial relationship with his child).

[19]   Rather, the magistrate judge acknowledged that T.M.2 had taken foster care classes and become a licensed foster parent in Virginia, and that she was willing to change her shift at work and make other accommodations in order for D.M. to be placed with her.  Although the magistrate judge noted that "[T.M.2] only recalled meeting [D.M.] once as a toddler" and "testified that she did not know everything about [D.M.]," those isolated findings fall well short of a determination that the proposed placement of D.M. with T.M.2 would be contrary to his best interest.  The magistrate judge also noted that Carr "had concerns about [T.M.] minimizing [D.M.]'s behaviors, as well as her work schedule and her ability to have or give appropriate care to [D.M.];" but the judge did not evaluate those concerns or weigh them in light of the totality of the evidence and the weight to be accorded T.M.'s preference.

judge, addressing this same claim of error, concluded that "[n]othing in the record below supports the contention that the Magistrate Judge failed to give preference to family members." We do not agree with that conclusion. It would be more accurate to say that nothing in the record assures us that the magistrate judge in fact gave the requisite weighty consideration to T.M.'s preference for placing D.M. with T.M.2. Moreover, in the absence of more detailed factual findings than were made here, such an omission cannot be cured by a *de novo* assessment of the evidence by the reviewing judge or this court. We do not mean to suggest that the magistrate judge could not have reached the conclusion on the record before us that T.M.'s preference was clearly contrary to D.M.'s best interest; perhaps he did reach that conclusion *sub silentio*. But he failed to put it in his order and explain it.

That, however, is the only material deficiency we perceive in the trial court's determination in this case. In reaching the conclusion that termination of parental rights was in D.M.'s best interest, the magistrate judge addressed each of the relevant statutory factors[20] and properly required proof by clear and convincing evidence.[21] The magistrate judge also considered whether the purposes of

---

[20] *See* D.C. Code § 16-2353 (2012 Repl.).

[21] *See In re C.M.*, 916 A.2d 169, 175 (D.C. 2007).

terminating parental rights would be served by granting the government's motion in this case—including the purpose of enhancing the opportunity for a prompt adoptive placement.[22]   Setting aside the question of T.M.2's candidacy as a custodian for D.M., there was ample evidentiary support for the conclusions that the magistrate judge reached with respect to all these factors.  This evidentiary support included testimony regarding D.M.'s special needs, which were a challenge even for his therapeutically-trained foster parent, T.D.; T.M.'s severe PCP dependence;[23] her lack of consistency in maintaining contact with D.M., which included showing up quite late or missing scheduled visitation sessions; and the quality of their interactions, during which D.M. sometimes acted more like a parent to T.M. than vice versa.  And notwithstanding the fact that no petition for adoption of D.M. was pending, the finding that he was "still a viable candidate for adoption" was supported not only by Carr's testimony but also, as the magistrate judge stated, by the potential adoptive interest expressed by T.D.  Thus, subject to

---

[22]   *See* D.C. Code § 16-2351 (a)(3) (2012 Repl.); *see also In re C.M.*, 916 A.2d at 178 (noting that in reviewing a termination of parental rights, the court "considers whether any of the three enumerated purposes offer an answer for the purpose of determining whether the termination of parental rights is warranted") (internal quotation marks omitted).

[23]   T.M. tested positive for PCP each time she submitted for a drug test and though she had been in seven to ten drug programs, she had not completed any. Despite this history, T.M. would not acknowledge that she was addicted to PCP or that she needed long-term treatment.

the need for further evaluation of T.M.'s preference for placing D.M. in the custody of T.M.2, we are not persuaded by T.M.'s contention that there was insufficient evidence to find the termination of her parental rights to be in D.M.'s best interest.

## III.

Because the magistrate judge failed to give the requisite consideration to T.M.'s choice of caretaker, we vacate the judgment of the Superior Court terminating her parental rights and remand the case for further proceedings consistent with this opinion.[24]

*So ordered.*

---

[24] We recognize and do not foreclose the possibility that changed circumstances also may need to be taken into account on remand in deciding whether to grant the District's motion for termination of parental rights.